Wis.]                AUGUST TERM, 1899.                7

Melms·and others vs. Pabst Brewing Co.м $\rho$ $any$

Melms and others, Appellants, vs. Pabst Brewing Company, Respondent.

*June 6 — September 26, 1899.*

*Waste: Changes enhancing value.*

1. A large dwelling-house built in 1864 in the city of Milwaukee had, as a result of the growth and development of the city, become surrounded by factories and railway tracks. It stood isolated, upon just enough ground to support it, from twenty to thirty feet above the level of the street, and was absolutely undesirable as a residence and incapable of any use as business property. In 1891 and 1892 the owner of a life estate, who stood in no contract relation to the reversioners, removed the building and graded down the land to about the level of the street, thereby largely enhancing the value of the property. *Held*, that this did not constitute actionable waste.

2. When there has occurred a complete and permanent change of surrounding conditions, which has deprived property of its value and usefulness as previously used, the question whether a life tenant, not bound by contract to restore the property in the same condition in which he received it, has been guilty of waste in making changes necessary to make the property useful, is a question of fact for the jury under proper instructions, or for the court when the question is tried by the court.

APPEAL from a judgment of the circuit court for Milwaukee county: GEO. CLEMENTSON, Judge. *Affirmed.*

This is an action for waste, brought by reversioners against the defendant, which is the owner of an estate for the life of another in a quarter of an acre of land in the city of Milwaukee. The waste claimed is the destruction of a dwelling-house upon the land, and the grading of the same down to the level of the street. The complaint demands double damages, under sec. 3176, Stats. 1898.

The quarter of an acre of land in question is situated upon Virginia street, in the city of Milwaukee, and was the homestead of one Charles T. Melms, deceased. The house thereon was a large brick building built by Melms in the year 1864,

and cost more than $20,000.  At the time of the building of the house, Melms owned the adjoining real estate, and also owned a brewery upon a part of the premises.  Charles. T. Melms died in the year 1869, leaving his estate involved in financial difficulties.  After his decease, both the brewery and the homestead were sold and conveyed to the *Pabst Brewing Company*, but it was held in the action of *Melms v. Pabst B. Co.* 93 Wis. 140, that the brewing company only acquired Mrs. Melms's life estate in the homestead, and that the plaintiffs in this action were the owners of the fee, subject to such life estate.  As to the brewery property, it was held in an action under the same title, decided at the same time, and reported in 93 Wis. 153, that the brewing company acquired the full title in fee.  The homestead consists of a piece of land ninety feet square, in the center of which the aforesaid dwelling house stood; and this parcel is connected with Virginia street on the south by a strip forty-five feet wide and sixty feet long, making an exact quarter of an acre.

It clearly appears by the evidence that after the purchase of this land by the brewing company the general character of real estate upon Virginia street about the homestead rapidly changed, so that soon after the year 1890 it became wholly undesirable and unprofitable as residence property. Factories and railway tracks increased in the vicinity, and the balance of the property was built up with brewing buildings, until the quarter of an acre homestead in question became an isolated lot and building, standing from twenty to thirty feet above the level of the street, the balance of the property having been graded down in order to fit it for business purposes.  The evidence shows without material dispute that, owing to these circumstances, the residence, which was at one time a handsome and desirable one, became of no practical value, and would not rent for enough to pay the taxes and insurance thereon; whereas, if the

property. were cut down to the level of the street, so as to be capable of being used as business property, it would again be useful, and its value would be largely enhanced.. Under these circumstances, and prior· to the judgment in the former action, the defendant removed the building and graded down the property to about the· level of the street, and these are the acts which it is claimed constitute waste.

The action was tried before the court without a jury, and the court found, in addition to the facts above stated, that. the removal of the building and grading down of the earth was done by the defendant in 1891 and 1892, believing itself to be the owner in fee simple of the property, and that by said acts the estate of the plaintiffs in the property was substantially increased, and that the plaintiffs have been in no way injured thereby. Upon these findings the complaint. was dismissed, and the plaintiffs appeal.

For the appellants there were briefs by *Bloodgood, Kemper & Bloodgood*, attorneys, and *Francis Bloodgood*, of counsel,. and oral argument by *J. B. Kemper* and *Francis Bloodgood.*

For the respondent there were briefs by *Winkler, Flanders, Smith, Bottum & Vilas*, and oral argument by *F. C. Winkler.*

The following opinion was filed July 3, 1899:

WINSLOW, J. Our statutes recognize waste, and provide a remedy by action and the recovery of double damages therefor (Stats. 1898, sec. 3170 *et seq.*); but they do not define it. It may be either voluntary or permissive, and may be of houses, gardens, orchards, lands, or woods (Id. sec. 3171); but, in order to ascertain whether a given act constitutes waste or not, recourse must be had to the common law as expounded by the text-books and decisions. In the present case a large dwelling house, expensive when constructed, has been destroyed, and the ground has been graded down, by the owner of the life estate, in order to make the property serve business purposes. That these acts would consti-

tute waste under ordinary circumstances cannot be doubted.
It is not necessary to delve deeply into the Year Books, or
philosophize extensively as to the meaning of early judicial
utterances, in order to arrive at this conclusion. The fol-
lowing definition of waste was approved by this court in
*Bandlow v. Thieme*, 53 Wis. 57: "It may be defined to be
any act or omission of duty by a tenant of land which does
a lasting injury to the freehold, tends to the permanent loss
of the owner of the fee, or to destroy or lessen the value of
the inheritance, or to destroy the identity of the property,
or impair the evidence of title." In the same case it was
also said: "The damage being to the inheritance, and the
heir or the reversioner having the right of action to recover
it, imply that the injury must be of a lasting and permanent
character." And in *Brock v. Dole*, 66 Wis. 142, it was also
said that "any material change in the nature and character
of the buildings made by the tenant is waste, although the
value of the property should be enhanced by the alteration."

These recent judicial utterances in this court settle the
general rules which govern waste, without difficulty, and it
may be said, also, that these rules are in accord with the
general current of the authorities elsewhere. But, while
they are correct as general expressions of the law upon the
subject, and were properly applicable to the cases under
consideration, it must be remembered that they are general
rules only, and, like most general propositions, are not to be
accepted without limitation or reserve under any and all
circumstances. Thus the ancient English rule which pre-
vented the tenant from converting a meadow into arable
land was early softened down, and the doctrine of meliorat-
ing waste was adopted, which, without changing the legal
definition of waste, still allowed the tenant to change the
course of husbandry upon the estate if such change be for
the betterment of the estate. Bewes, Waste, 134 *et seq.*, and
cases cited. Again, and in accordance with this same prin-

ciple, the rule that any change in a building upon the premises constitutes waste has been greatly modified, even in England; and it is now well settled that, while such change may constitute technical waste, still it will not be enjoined in equity when it clearly appears that the change will be, in effect, a meliorating change which rather improves the inheritance than injures it. *Doherty v. Allman*, 3 App. Cas. 709; *In re McIntosh*, 61 Law J. Q. B. 164. Following the same general line of reasoning, it was early held in the United States that, while the English doctrine as to waste was a part of our common law, still the cutting of timber in order to clear up wild land and fit it for cultivation, if consonant with the rules of good husbandry, was not waste, although such acts would clearly have been waste in England. Tiedeman, Real Prop. (2d ed.), § 74; Rice, Mod. Law Real Prop. §§ 160, 161; *Wilkinson v. Wilkinson*, 59 Wis. 557.

These familiar examples of departure from ancient rules will serve to show that, while definitions have remained much the same, the law upon the subject of waste is not an unchanging and unchangeable code, which was crystallized for all time in the days of feudal tenures, but that it is subject to such reasonable modifications as may be demanded by the growth of civilization and varying conditions. And so it is now laid down that the same act may be waste in one part of the country while in another it is a legitimate use of the land, and that the usages and customs of each community enter largely into the settlement of the question. Tiedeman, Real Prop. (2d ed.), § 73. This is entirely consistent with, and in fact springs from, the central idea upon which the disability of waste is now, and always has been, founded, namely, the preservation of the property for the benefit of the owner of the future estate without *permanent* injury to it. This element will be found in all the definitions of waste, namely, that it must be an act resulting in permanent injury to the inheritance or future estate.

It has been frequently said that this injury may consist either in diminishing the value of the inheritance, or increasing its burdens, or in destroying the identity of the property, or impairing the evidence of title.    The last element of injury so enumerated, while a cogent and persuasive one in former times, has lost most, if not all, of its force at the present time.    It was important when titles were not registered, and descriptions of land were frequently dependent upon natural monuments or the uses to which the land was put; but since the universal adoption of accurate surveys and the establishment of the system of recording conveyances, there can be few acts which will impair any evidence of title.    *Doherty v. Allman*, 3 App. Cas. 709; Bewes, Waste, 129, 130, *et seq.*    But the principle that the reversioner or remainderman is ordinarily entitled to receive the identical estate, or, in other words, that the identity of the property is not to be destroyed, still remains, and it has been said that changes in the nature of buildings, though enhancing the value of the property, will constitute waste if they change the identity of the estate.    *Brock v. Dole*, 66 Wis. 142.    This principle was enforced in the last-named case, where it was held that a tenant from year to year of a room in a frame building would be enjoined from constructing a chimney in the building against the objection of his landlord.    The importance of this rule to the landlord or owner of the future estate cannot be denied.    Especially is it valuable and essential to the protection of a landlord who rents his premises for a short time.    He has fitted his premises for certain uses.    He leases them for such uses, and he is entitled to receive them back at the end of the term still fitted for those uses; and he may well say that he does not choose to have a different property returned to him from that which he leased, even if, upon the taking of testimony, it might be found of greater value by reason of the change.    Many cases will be found sustaining

this rule; and that it is a wholesome rule of law, operating to prevent lawless acts on the part of tenants, cannot be doubted, nor is it intended to depart therefrom in this decision. The case now before us, however, bears little likeness to such a case, and contains elements so radically different from those present in *Brock v. Dole,* 66 Wis. 142, that we cannot regard that case as controlling this one.

There are no contract relations in the present case. The defendants are the grantees of a life estate, and their rights may continue for a number of years. The evidence shows that the property became valueless for the purpose of residence property as the result of the growth and development of a great city. Business and manufacturing interests advanced and surrounded the once elegant mansion, until it stood isolated and alone, standing upon just enough ground to support it, and surrounded by factories and railway tracks, absolutely undesirable as a residence and incapable of any use as business property. Here was a complete change of conditions, not produced by the tenant, but resulting from causes which none could control. Can it be reasonably or logically said that this entire change of condition is to be completely ignored, and the ironclad rule applied that the tenant can make no change in the uses of the property because he will destroy its identity? Must the tenant stand by and preserve the useless dwelling-house, so that he may at some future time turn it over to the reversioner, equally useless? Certainly, all the analogies are to the contrary. As we have before seen, the cutting of timber, which in England was considered waste, has become in this country an act which may be waste or not, according to the surrounding conditions and the rules of good husbandry; and the same rule applies to the change of a meadow to arable land. The changes of conditions which justify these departures from early inflexible rules are no more marked nor complete than is the change of conditions which destroys

the value of residence property as such and renders it only useful for business purposes. Suppose the house in question had been so situated that it could have been remodeled into business property; would any court of equity have enjoined such remodeling under the circumstances here shown, or ought any court to render a judgment for damages for such an act? Clearly, we think not. Again, suppose an orchard to have become permanently unproductive through disease or death of the trees, and the land to have become far more valuable, by reason of new conditions, as a vegetable garden or wheat field, is the life tenant to be compelled to preserve or renew the useless orchard, and forego the advantages to be derived from a different use? Or suppose a farm to have become absolutely unprofitable by reason of change of market conditions as a grain farm, but very valuable as a tobacco plantation, would it be waste for the life tenant to change the use accordingly, and remodel a now useless barn or granary into a tobacco shed? All these questions naturally suggest their own answer, and it is certainly difficult to see why, if change of conditions is so potent in the case of timber, orchards, or kind of crops, it should be of no effect in the case of buildings similarly affected.

It is certainly true that a case involving so complete a change of situation as regards buildings has been rarely, if ever, presented to the courts, yet we are not without authorities approaching very nearly to the case before us. Thus, in the case of *Doherty v. Allman,* 3 App. Cas. 709, before cited, a court of equity refused an injunction preventing a tenant for a long term from changing storehouses into dwelling-houses, on the ground that by change of conditions the demand for storehouses had ceased and the property had become worthless, whereas it would be productive when fitted for dwelling-houses. Again, in the case of *Sherrill v. Connor,* 107 N. C. 630, which was an action for permissive waste against a tenant in dower, who had permitted large

barns and outbuildings upon a plantation to fall into decay, it was held that, as these buildings had been built before the Civil War to accommodate the operation of the plantation by slaves, it was not necessarily waste to tear them down, or allow them to remain unrepaired, after the war, when the conditions had completely changed by reason of the emancipation and the changed methods of use resulting therefrom; and that it became a question for the jury whether a prudent owner of the fee, if in possession, would have suffered the unsuitable barns and buildings to fall into decay, rather than incur the cost of repair. This last case is very persuasive and well reasoned, and it well states the principle which we think is equally applicable to the case before us. In the absence of any contract, express or implied, to use the property for a specified purpose, or to return it in the same condition in which it was received, a radical and permanent change of surrounding conditions, such as is presented in the case before us, must always be an important, and sometimes a controlling, consideration upon the question whether a physical change in the use or the buildings constitutes waste.

In the present case this consideration was regarded by the trial court as controlling, and we are satified that this is the right view. This case is not to be construed as justifying a tenant in making substantial changes in the leasehold property, or the buildings thereon, to suit his own whim or convenience, because, perchance, he may be able to show that the change is in some degree beneficial. Under all ordinary circumstances the landlord or reversioner, even in the absence of any contract, is entitled to receive the property at the close of the tenancy substantially in the condition in which it was when the tenant received it; but when, as here, there has occurred a complete and permanent change of surrounding conditions, which has deprived the property of its value and usefulness as previously used, the

question whether a life tenant, not bound by contract to restore the property in the same condittition in which he re-ceived it, has been guilty of waste in making changes nec-essary to make the property useful, is a question of fact for the jury under proper instructions, or for the court where, as in the present case, the question is tried by the court.

*By the Court.*— Judgment affirmed.

A motion for a rehearing was denied September 26, 1899.