ALFRED L. PEER and ARTHUR M. PEER

*v.*

FRANK WADSWORTH and GOERKE COMPANY.

[Filed June 14th, 1904.]

1. Converting windows in a leased building into open passageways, and constructing from them bridges connecting with similar openings in a building on the opposite side of an alley and closing up entrances to the leased building, constitute alterations, within the covenant of the lease stipulating that the lessee will not cut through the walls of the leased

building, nor make any alterations, without the written permission of the lessor.

2. In equity, a subtenant is chargeable with notice of the covenants in the original lease, and the landlord therein has the same remedy against him as against any other purchaser with notice.

3. On the issue whether a landlord, in a lease prohibiting the making of alterations in the leased premises without his permission, orally consented to alterations, evidence examined, and *held* not to prove consent.

4. A landlord's oral permission to his subtenant to make alterations in the leased premises which will give the subtenant an easement of ingress and egress into the building during the five-year term of the sublease, is void under the statute of frauds.

5. A landlord, in a lease prohibiting the making of alterations in the leased premises without his permission, is entitled to specific performance, though the damages sustained in consequence of the making of alterations without his consent are recoverable at law.

6. Converting windows in a leased building into doors, and constructing from them bridges connecting with similar openings in another building,. constitute waste, entitling the landlord to relief in equity.

Heard on bill, supplemental bill, answer, replication and proofs.

*Mr. Elvin W. Crane,* for the complainants.

*Mr. Louis Hood,* for the defendant company. ·

*Mr. George H. Lambert,* for the defendant Wadsworth.

EMERY, V. C.

The complainants, as owners of the fee and lessors, file this bill against Wadsworth, their lessee, and the Goerke Company, a sublessee of part of the leased premises, to enjoin the violation of a covenant in the lease, relating to cutting through the walls of the building on the premises and to compel the restoration of the walls to their original condition when leased. The premises leased to Wadsworth comprised a four-story building, No. 157 Market street, in the city of Newark, and a building adjoining it in the rear in the shape of an "L," fronting on another street, this "L" extension being known as No. 12 Library court. This latter building extended also in the rear of the buildings Nos..

151 to 155 Market street, lying west of No. 157, and which were not owned by the lessors. The eastern wall of No. 157 Market street bounded on an alley known as Wilbur's alley. At the time of the execution of the lease (October 30th, 1901), there was an entrance into No. 12 Library court from No. 151 Market street through an opening in the wall between the two buildings. The only openings in the eastern wall of No. 157 Market street at that time were the windows of the buildings opening into the alley, and there were such windows on the second, third and fourth stories. The entire premises, No. 157 Market street and No. 12 Library court, were used for store purposes, and the entrance to the second, third and fourth stories of No. 157 Market street was through the first floor of the building, from which a stairway ran to the second story. The lease, which was for three years at a yearly rent of $3,300, besides taxes, assessments, water rents and repairs, contained the following covenant relating to openings in the walls of the buildings:

"And it is further understood and agreed that at the expiration of this lease, upon the request of the party of the first part [the lessors] in writing, the party of the second part shall close with brick the entrance cut through from said No. 12 Library court to No. 151 Market street, and no other outside wall or walls of or between No. 157 Market street and No. 12 Library court shall be cut through by the party of the second part, nor shall any alterations or additions be made without the written permission of the party of the first part."

The lease contained a further covenant on the part of the lessee not to use the premises, or any part thereof, or permit any part to be used for any purpose more hazardous than that of an ice cream and candy factory and store, without the written consent of the lessors, their heirs, assigns, agents or attorneys, under the penalty of forfeiture and damages. It was further agreed that the lessee might have the right to sublet any part or portion of the premises, provided the occupation should not be for any more hazardous business, and that the conditions, obligations and agreements of the lessee should bind the lessee, his heirs and assigns, and that each and every one of the considerations specified were to be performed fully and in the manner specified. Wadsworth took possession of the entire premises.

13

under this lease, and on February 10th, 1902, a further lease to him of the premises for five years from April 1st, 1904 (the termination of the first lease), at the yearly rent of $10,000, besides taxes, assessments, water rents and repairs. This second lease contained a clause relating to the cutting of the walls and the use of the premises somewhat different in form, as follows:

"And it is further understood and agreed that at the expiration of this lease, upon request of the party of the first part, in writing, the party of the second part shall close with brick the entrance cut through from said No. 12 Library court and No. 151 Market street, and that he will not cut through any other walls of the premises hereby demised, nor make any alterations or additions, nor sell or assign this lease, nor use or permit the whole or any part thereof to be used for any other purpose than an ice cream and candy factory and store, without the written consent of the said party of the first part, their heirs, assigns or attorneys, under the penalty of forfeiture and damages."

The conditions, obligations and agreements of this lease were also binding on the lessee, his heirs and assigns, and each of the considerations specified was to be performed fully and as set forth. The second lease contained no provisions relating to subletting.

On August 7th, 1902, the lessee gave a sublease of the second, third and fourth stories of No. 157 Market street for seven years, at the yearly rent of $1,200, to the defendants, the Goerke Company, who then owned or occupied the building across the alley, No. 159 Market street, and carried on there and also in Nos. 153 and 155 Market street, adjoining the leased premises on the west, the business of a large department store. By the sublease the Goerke Company agreed not to use any part of the premises, nor permit them to be used, for any other purpose more hazardous than that of an ice cream and candy factory, nor for any other purpose save such as was permissible under the two indentures of lease to Wadsworth, which were recited. The sublease contained the following recital in relation to the use of the premises No. 157 Market street by the subtenant in connection with their store No. 155 Market street and with their other store, No. 159 Market street, on the east side of the alley:

"And it is further agreed between the parties hereto that whereas, the said The Goerke Company is the lessee or owner or occupants of divers premises adjoining the premises hereinabove demised, and also of other premises to the east of the premises hereby demised and separated therefrom by a certain street known as Wilbur's alley;

"And whereas, it is the intention of the Goerke Company to use the said premises in connection with the other premises hereinabove mentioned leased, occupied or owned by it, and for that purpose to connect the premises herein demised with the premises aforesaid by means of bridges or other means or methods of connection :

"Now, therefore, it is agreed between the parties hereto that for the purpose of making said connections or communications between the demised premises and the other premises leased, used or occupied by the said The Goerke Company, the said The Goerke Company take such possession of the premises herein demised before the aforesaid first day of October, nineteen hundred and two, as may be necessary for the said Goerke Company to have for the purpose of making the aforesaid connections or communications, so that the same may be completed before the said first day of October, and in the event that the said The Goerke Company shall take possession of the premises aforesaid prior to the first day of October, nineteen hundred and two, then the said Goerke Company shall, at its own expense, move the property of the said party of the first part from the said demised premises to one hundred and fifty-one Market street, in the city of Newark.

"And it is further agreed between the parties hereto that whereas divers questions may arise in making the connections or communications in the last preceding clause referred to between the premises herein demised and the premises now leased, occupied or owned by the Goerke Company if the said The Goerke Company shall fail to secure consent according to the terms of said lease or if for any reason the said The Goerke Company shall be unable to make the said connections and communications, then, at the option of the said The Goerke Company, its successors and assigns, the said The Goerke Company may surrender this lease, and upon the making of said surrender, this indenture of lease and anything herein contained shall cease and terminate, anything hereinbefore to the contrary notwithstanding; and in the event of the terminating of the said lease as aforesaid, if the said The Goerke Company shall have taken possession of the said demised premises for the purpose of making the connections and communications in this lease mentioned, and shall have moved the said party of the first part to the premises one hundred and fifty-one Market street, then and in such event the said Goerke Company, at its own expense, shall remove the property of the said party of the first part by it theretofore moved and replace the same upon the premises herein demised."

After the execution of this sublease, and about the middle of September, 1902, the defendant company cut down to the

floor a window in the eastern wall of the second story of No. 157 Market street, converting it into an open passageway, and constructed from it a bridge connecting with a similar opening in No. 155 Market street. Subsequent to the filing of the bill, similar connections, by the conversion of windows into passageways and by bridges built into the wall, have been made between the third and fourth stories of these buildings. The former entrance to the second story of No. 157 Market street from the first story has been closed up by the lessee and the subtenant, and the entire access to the second, third and fourth stories of the complainants' building is now from the defendant company's other buildings in Market street. The bridges over the alley, which are fastened at one end in the complainants' buildings, are now used for providing the sole ingress and egress into the three upper stories of their building from the defendants' other buildings. All of these alterations or erections, and this use of the building, have taken place without the written consent of either of the complainants, and the first bridge was constructed during the absence of both the owners from the city and without their knowledge. These alterations come within the reach of the covenants in both of the leases, and, as I think, they constitute such a substantial alteration of the building and in its use as to constitute a waste of the premises. At law there is no privity of estate or contract between the original lessor and the subtenant, *1 Tayl. Land. & T. (8th ed.)* §§ *109, 448,* but in equity a subtenant who enters on the land is chargeable with notice of the covenants in the lease relating to its use, *1 Tayl. Land. & T. (8th ed.)* § *109, Cosser* v. *Collinge, 3 Myl. & K. 283,* and the landlord has the same remedy in equity against the subtenant as against any other purchaser with notice. In this case the sublease was expressly made with reference to the covenants of the original leases, restricting the right to open the walls of the building without written consent of the lessors. The defendant Wadsworth does not claim any consent of either lessor, by writing or otherwise, nor does he at the hearing claim that any permission of any kind was given

to him personally. After the execution of the sublease, and on August 25th, learning that the alterations were proposed to be made without procuring the previous consent of the landlords in writing, he notified his subtenant, in writing, not to cut any openings in the outer walls of No. 157 Market street. The Goerke Company sets up the parol permission of Alfred L. Peer, one of the lessors, to the erection of the bridges as being a waiver of the covenant and an estoppel against equitable relief. It is claimed that this permission was given by Alfred L. Peer, in March, 1902, to a Mr. Safford, an employe of the company, in a conversation between them, in March, 1902, several months before the sublease, when Mr. Safford called on Alfred L. Peer, ostensibly, as Safford says, with a view of obtaining the price of the property, and in the course of which conversation the verbal permission now set up was said to have been given. Mr. Alfred L. Peer denies that any such permission was given, and says that at that conversation, when the matter of bridging the alley was mentioned, he directed Mr. Safford to inform the Goerke Company that the owners of the property would consider an amount of $2,500 a year for the privilege, and that no permission was given. In this account of the conversation he is corroborated by his wife, who was present. In the statement that no permission to bridge the alley and connect the buildings was then given or intended to be given on behalf of either of the owners to the Goerke Company, and that Mr. Goerke, the president of the company, did not so understand and did not act on any such understanding, complainants are corroborated by the proof of two subsequent conversations held with Mr. Goerke himself. The first occurred about a week after Mr. Safford's interview, when Mr. Goerke called on Mr. Alfred L. Peer, at the house of the latter in Newark, and then received from him, as Alfred L. Peer says, the same answer to his application to know what money consideration the owners would take for bridging the alley. The second conversation occurred between Arthur M. Peer, the other complainant, who, on April 15th, 1902, came to Newark for the express purpose

of seeing Mr. Goerke in relation to this matter, and saw him, as he says, at his brother Alfred's house, where he gave substantially the same terms. Goerke denies that he ever had either of these conversations, and also denies that he was ever in Alfred L. Peer's house, in Newark, between the time of Safford's interview and September, 1902, after the first bridge was built. That Goerke was at Alfred L. Peer's on both occasions between these dates, is to my mind satisfactorily established—as to the first, by the evidence of Mr. and Mrs. Alfred L. Peer, and as to the second interview by their evidence in addition ·to that of Arthur M. Peer. That the conversation of Mr. Alfred L. Peer with Safford was not taken or understood by Goerke to have been intended as a permission which was intended to waive, on the part of either lessor, the right to require the written consent under the lease, and was not acted on as such permission, is further indicated by the circumstance that the Goerke Company did not procure the sublease until several months later; that the sublease itself indicates that the consent of the lessors had not yet been procured, and that up to the time of the answering affidavits in the suit Mr. Goerke did not set up this alleged permission given through Safford, in March, as his justification of the erections. No mention was made of it at either of his conversations in March or April, 1902, nor at the first conversation he held with Alfred L. Peer, in September, 1902, when the latter charged him with having violated the lease. Treating the question of the parol permission given by one of the lessors as an issue of fact, I conclude, on the evidence, that it has not been proved. But as the permission relates to the use of lands, and if proved will give to the defendant company an easement of ingress and egress into complainants' building through its upper walls for the whole term of their sublease, it comes within the operation of the statute of frauds and the rule settled in *Lawrence* v. *Springer, 49 N. J. Eq.* (*4 Dick.*) *289* (*Court of Errors and Appeals, 1892*). In that case, Chief-Justice Beasley, after declaring his opinion to be that easements cannot be imposed on lands by parol evidence,

and that parol licenses cannot have that effect in equity merely because they have been executed, says (at·*p. 297*) that the parol contract can never be enforced in equity until it be proved to the point of demonstration, and unless it also appears that the repudiation of it must work irreparable injury. In this case the parol permission has not been proved, and the fact that the sublease reserved to the company the right to terminate its lease if the consent is not obtained according to the terms of the lease (*i.· e.,* a written consent is not obtained), is cogent, if not conclusive, evidence as well on the point that the sub-tenant did not rely on Safford's permission as the ground for either taking the lease or altering the building, as upon the point that the removal of the bridges is not an irreparable injury. The fact that the entrance to the upper stories, which existed when the sublease was made, has been closed since the sublease by the action of the parties thereto, without any con-sent or communication with the lessors, cannot affect the right of the lessors to be protected against alterations of the building and openings of the walls under the express covenants of the lease. In disposing of this branch of the case I have not con-sidered the point raised by complainants' counsel, that parol permission given by one lessor is not effective under the covenant and that the waiver of both lessors must be shown, but I am inclined to think the objection well founded.

It was contended at the hearing that the complainants' remedy was at law, and that an injunction, mandatory or other, could not be granted, because no irreparable injury to complainants had been or would be caused, and complainants' damages were the proper subject of money compensation by action for damages. It is, however, settled law that agreements restricting within reasonable limits the use of premises may be made upon their sale or lease, and that when such restrictions are made, they are considered to be part of the consideration upon which the vendee or lessee receives the premises or their possession. The vendor or lessor is therefore usually entitled to the specific per-formance of the lawful agreements relating to the use or enjoy-

ment of the property sold or leased, and the equitable jurisdiction to enjoin the violation of the agreement does not depend on irreparable injury or lack of adequate relief at law, but is founded on the right to specific performance of contracts. *Kirkpatrick* v. *Peshine, 24 N. J. Eq. (9 C. E. Gr.) 206 (Chancellor Zabriskie, 1873),* states the principle in relation to covenants in the sale of premises, and where positive stipulations as to acts of waste are made between the parties to a lease, either party has the right to insist on the literal performance of the contracts, irrespective of the question of damages. *Kerr Inj. *83, 440, 441; Steward* v. *Winters, 4 Sandf. Ch. 587, 592 (1847)* ; and as to defendant company no action at law could be brought on the covenant. *Tayl. Land. & T., supra.*

Independent of the jurisdiction to enforce covenants, the injunction in this case may properly be granted on the ground that the changes made by the defendant company are material alterations of the building, which constitute waste. Windows admitting light are discontinued and openings for doors substituted, a material difference in the easement in the adjoining alley. A subtenant may be enjoined from committing waste. *Farrant* v. *Lovell, 3 Atk. 723.* Complainants are therefore entitled to a mandatory injunction requiring the removal of the bridges from the walls and alley and the restoration of the windows, and a perpetual injunction against the erection of bridges in the future. On the application for preliminary injunction the defendant company, as a condition for denying it, gave a bond to pay damages, to be assessed by this court. I will hear counsel on the order or decree to be made in reference to the damages.