THE CREWE CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. F. CHARLES FEILER, DEFENDANT-RESPONDENT, AND MORRIS WEST, DEFENDANT.

Argued September 23, 1958—Reargued November 17, 1958—Decided December 1, 1958.

*Mr. Justin W. Seymour* argued the cause for appellant (*Messrs. Seymour & Seymour,* attorneys; *Mr. Justin W. Seymour,* of counsel).

*Mr. Julius Fielo* argued the cause for respondent F. Charles Feiler.

The opinion of the court was delivered by

WEINTRAUB, C. J.  Plaintiff lessor sued to recover from the lessees the amount of increase in municipal taxes allegedly due to improvements made by the lessees.  On motion before answer, defendants obtained summary judgment.  The Appellate Division affirmed by a divided court, 49 *N. J. Super.* 532 (*App. Div.* 1958), and plaintiff accordingly prosecuted this appeal as of right.  *Const. of* 1947, *Art.* VI, § V, *par.* (1)(*b*);  *R. R.* 1:2–1(*b*).  The appeal concerns only defendant Feiler.  Defendant West prevailed on additional

grounds not presently pertinent, and plaintiff does not seek a review as to him. Upon our initiative, there was a re-argument with respect to the lessees' right to make the improvements under the terms of the lease or under principles of law applicable in the absence of an express agreement.

The uncontradicted affidavit filed on behalf of plaintiff reveals the following:

Plaintiff had conducted a general family laundry business upon the premises. It sought to sell the property. Defendants were interested in purchasing but lacked the required cash. A deal was made for a lease for 15 years with an option to buy for $60,000. Defendants said they were not interested in the laundry business as theretofore conducted by plaintiff, but rather intended to operate a "quick service laundry business" on the first floor of the main building and to sub-lease the second floor to "a tenant like a dress manufacturer."

The lease was executed on October 30, 1953, the term to begin on January 1, 1954. In consonance with their contemplated operation, defendants purchased certain equipment from plaintiff, moved in other laundry equipment, formed a firm known as "Three Hour Cleaning and Laundry Company," erected an appropriate sign, and proceeded to make alterations for the laundry business. The affidavit continues:

"8. In all events, the defendants before completing the alterations to the building for a quick service laundry above mentioned, abandoned such alterations and instead turned the building into an office building. To make such changes required a complete renovation of the building. All the laundry equipment and fixtures were removed as well as the old plumbing and heating system, light fixtures, partitions and sky-lights. New metal windows and light fixtures were installed, the floors, walls, ceilings and roof refinished, and new wash rooms and toilet facilities were installed on the 1st and 2nd floors. An open driveway was enclosed and added to the 1st floor, the front and side of the building was refaced with brick and a new front entrance and 2nd floor stairway were erected. The building was completely air conditioned. The defendant Feiler told me that the costs of these improvements amounted to $75,000.00.

Later the frame garage building was demolished and all the open area of the property was covered with black top for the parking of vehicles.

9. It was my understanding then, as it is now, that these improvements were made by the defendants having regard to my intention to sell the property and their intention to buy. In fact, they proceeded to treat the property as if it was their own. They went ahead with the improvements without advising me about them although I lived nearby and knew that they were being made and from time to time met the defendants and talked to them about the improvements. They did not ask my consent to making the improvements except in a few instances when the municipal authorities required it and in each instance I gave my consent promptly.

10. Not only did the defendants proceed with the improvements as above stated but also they removed without advising me the heating furnace, hot water system, water softener and elevator mentioned in Paragraph 6 herein. I had only recently installed an electric panel board at a cost of several hundred dollars which they also removed and the water softener and hot water tank which cost me approximately $4,000.00. This equipment was, I believe, sold by the defendants and they retained the proceeds. Later the defendants removed the frame garage building as above mentioned. Considerable new timber had been put into the garage building in recent years but the defendant Feiler told me that he did not get anything for the building but had to pay to have it removed."

The complaint alleges that on September 21, 1955 defendants leased the second floor to an insurance company for an annual rent of $13,500 and on October 17, 1955 leased the first floor for an annual rent of $11,350.

The monthly rental under the lease here involved is $625 for an annual total of $7,500. Plaintiff charges the improvements or alterations led to an increase in tax dollars payable upon the buildings from $2,000 to $4,700 per year, thus reducing the yearly rental yield by $2,700, a reduction of 36%. Taxes being assessed against the fee and a lien thereon, *Becker v. Little Ferry*, 126 *N. J. L.* 338 (*E. & A.* 1941), plaintiff was compelled to pay, and accordingly here seeks to recover the portion it claims defendants should bear.

The lease does not authorize alterations or improvements in express terms. The sole reference to the subject appears in a provision permitting immediate entry by the lessees "for the purpose only of completing plans and making

measurements in connection with the alterations which they contemplate." The complaint alleges "the alterations contemplated * * * related only to the modernizing of said laundry processing plant." On the oral argument before us, defendant conceded the alterations thus referred to did not embrace those in fact made to convert the industrial structure into an office building.

The covenant upon which the majority of the Appellate Division deemed the case to turn reads:

"Landlord agrees to pay promptly municipal real estáte taxes and fire insurance premiums and upon demand of the tenant to submit for inspection receipted bills for the same or adequate proof of payment."

This provision was held to be an agreement to pay taxes attributable to the improvements the lessees made. We cannot agree. The covenant of course applies to taxes upon the premises as they existed when leased, but we cannot find therein an undertaking to pay taxes resulting from the improvements. We so conclude because the improvements were not authorized either by the lease or by applicable principles of law and hence could not have been within the contemplation of the parties when they agreed upon the tax covenant.

Preliminarily, certain rules may be noted with respect to liability for taxes on *authorized* improvements made by a lessee in the absence of an express agreement providing for their payment. It is usually said that as between himself and his lessor the lessee must bear the burden if he has the right to remove the improvement, the landlord being otherwise chargeable. 32 *Am. Jur., Landlord and Tenant,* § 288, *p.* 268; *Miller v. Buck Creek Oil Co.,* 38 *Wyo.* 505, 269 *P.* 43, 73 *A. L. R.* 824 (1931). Perhaps the ultimate test is whether the lessee erected the improvement for his sole benefit. 1 *American Law of Property* (1952), § 3.77, *p.* 345. Under that approach, the improvements here involved were for the sole benefit of the lessees and the additional tax burden would be theirs. They have an option to buy at a fixed price and

hence the right to "remove" the improvement in the practical sense that they can by exercise of the option deny to the lessor any benefit from the improvement as effectively as if the improvement were a structure subject to a lessee's right of physical removal.

The parties may contract for a different result and the Appellate Division concluded they did. If here permission to improve were given in the lease or were provided by law, it could then be debated whether on the total facts (including the option to buy) the lessor's covenant quoted above should fairly be read as an agreement to pay the taxes in question. See *Kentucky Farm and Cattle Co. v. Williams*, 140 F. Supp. 449 (*E. D. Ky.* 1956); *Callahan v. Broadway National Bank of Chelsea*, 286 Mass. 473, 190 N. E. 792 (*Sup. Jud. Ct.* 1934); *Phinney v. Foster*, 189 Mass. 182, 75 N. E. 103 (*Sup. Jud. Ct.* 1905); *Amoskeag Savings Bank v. Shell Eastern Petroleum Products*, 89 N. H. 30, 192 A. 149 (*Sup. Ct.* 1937); *Spoor-Lasher Co. v. Newburgh Gas & Oil Co.*, 245 App. Div. 329, 280 N. Y. S. 585, 587 (*2nd Dep't.* 1935), affirmed 269 N. Y. 447, 199 N. E. 656 (*Ct. App.* 1936); *Witschger v. Kamages*, 275 App. Div. 1053, 92 N. Y. S. 2d 165 (*2nd Dep't.* 1949); Note, 21 *Corn. L. Q.* 146 (1935). But if, on the other hand, the improvements were not thus authorized, then, as we have said, the added tax burden could not have been contemplated by the tax covenant, and accordingly the liability would be the lessees' under the principles stated above.

We therefore proceed to the issue upon which the lessees must prevail if they are to have any hope of invoking the tax covenant, namely, were the improvements authorized either by the lease or by law?

We have already pointed out that the lease did not expressly authorize the improvements, the sole reference being to certain "contemplated" alterations, which concededly are not those here involved. See *Braunstein v. McGrory Stores Corp.*, 93 N. J. Eq. 419 (*E. & A.* 1921). Upon reargument, counsel for defendant stressed the fact that the parties had struck out a printed clause providing for damages and

forfeiture if alterations, additions or improvements were made without the lessor's written consent and that all additions and improvements made by the lessees shall belong to the lessor. Counsel for plaintiff counters with the assertion that the deletion was made because the provision would conflict with the intended authorization for the "contemplated" alterations to which we have referred. It is sufficient to say that, as the lease stands, the deletion of the clause does not spell out an affirmative right in the lessees to make any and all improvements. Nor, as we have said, does the covenant to pay taxes in itself either authorize improvements or evidence a purpose to assume a tax burden with respect to improvements which are unauthorized. Standing alone, it serves merely to give the lessees a contractual right to performance by the lessor of its obligation to meet the tax burden upon the premises as they were at the time of the demise, and to receive evidence of that performance for their better protection as holders of a 15-year term and an option to buy. Nor can authority be found in the expressed purpose of the letting:

"* * * to be used and occupied as a retail and commercial laundry, dry cleaning plant, and any other sundry and kindred enterprises which might be considered an adjunct of a laundry business, or *such other lawful purpose as the tenant or any sub-tenant may require whether related to the laundry or dry-cleaning business, or not.*" (Emphasis added)

The italicized language permits such other uses of the demised premises as the premises existed at the time of the letting; it does not by implication authorize the lessees to do whatever they may wish to make the demised premises suitable for any and all conceivable purposes.

Nor can the lessees claim authority for the improvements under the applicable law relating to the rights of a lessor and lessee when the lease is silent on the subject. On the contrary (putting aside the impact of plaintiff's consents given during the alterations to which further reference will be made below), it is clear that defendants' conduct violated

the lessor's rights. That this is so is evident from an examination of the doctrine of waste.

Our act dealing with waste was drawn from the ancient statutes of Marlbridge and Gloucester. *Camden Trust Co. v. Handle,* 132 *N. J. Eq.* 97, 100 (*E. & A.* 1942); *Townshend v. Moore,* 33 *N. J. L.* 284 (*Sup. Ct.* 1869). *N. J. S.* 2A:65–2 provides:

"No tenant in dower or curtesy or for life, years or any term, shall, during the term, make or suffer any waste, sale or destruction of any property belonging to the tenements demised, without special license in writing."

The term "waste" is not therein defined. The classic view is that a tenant may not make material changes or alterations in a building to suit his taste or convenience and that any material change in the nature or character of the buildings is waste, even though the value of the property be enhanced thereby. 2 *Tiffany, Real Property* (2d ed. 1939), § 636, *p.* 642; 4 *Thompson, Real Property* (1940), § 1615, *p.* 118; 32 *Am. Jur., Landlord and Tenant,* § 206, *p.* 194; *Pearson v. Sullivan,* 209 *Mich.* 306, 176 *N. W.* 597, 9 *A. L. R.* 445 (*Sup. Ct.* 1920); *F. W. Woolworth Co. v. Nelson,* 204 *Ala.* 172, 85 *So.* 449, 13 *A. L. R.* 824 (*Sup. Ct.* 1921).

Undoubtedly, the concept of waste is far from rigid in its practical application. Conduct once permissible in an agrarian economy would today be proscribed, and acts then deemed wrongful would today be warranted. There are many variables. It is reasonable to assume that the parties to a 99-year lease contemplate the possibility of obsolescence, physical or economic, and hence intend a substantial right in the lessee to change the property in the interest of a fruitful enjoyment. In such situations, the reversionary interests are concerned more with the rental yield than with the character of the buildings. *Klie v. Von Broock,* 56 *N. J. Eq.* 18, 29 (*Ch.* 1897). On the other hand, in short-term lettings, the landlord is interested not only in the rental income but as well in the basic integrity of the struc-

tures which will shortly return to his possession. There the lessee's right to alter or improve must be more sharply contained. No easy formula can be prescribed. The law seeks a reasonable result, consonant with the probable intent of the parties, which will permit beneficial enjoyment without injury to the landlord's estate. The answer must depend upon the nature and extent of the change in relation to the total facts.

The record before us shows substantial material changes. A building designed for industrial purposes was revamped into an office building, a wholly incompatible structure. There is no suggestion of intervening obsolescence, physical or economic. Such changes are clearly beyond the intention of the parties and constitute waste. *Klie v. Von Broock, supra* (56 *N. J. Eq.* 18); *Peer v. Wadsworth,* 67 *N. J. Eq.* 191 (*Ch.* 1904); *Kinney Realty Co. v. Salmon,* 106 *N. J. Eq.* 389 (*Ch.* 1930); *cf. Union County Trust Co. v. Goerke Co.,* 105 *N. J. Eq.* 190, 194 (*E. & A.* 1929).

Today there undoubtedly is a disposition to relax the concept of waste. Frequently questioned is the proposition that alterations or improvements may constitute waste even though they enhance the value of the property. No authority, however, appears to suggest that the single fact of enhancement in value should warrant any and all changes. Apart from the speculative nature of an inquiry into the value as of the date when the lessee's term will end, it would be unfair and contrary to the reasonable expectation of the parties to deprive the lessor of the specific rental benefit for which he bargained and to force upon him a substituted consideration to which he did not agree. The element of increased value can be but one of the many factors, having its greatest influence in long-term arrangements.

The emphasis in the present-day approach remains upon the element of prejudice to the remainder. 5 *American Law of Property* (1952), § 20.1, *p.* 72. *Restatement, Property* (1936), § 138, *p.* 450, adopts the view that a life tenant "has a duty not to act upon the land * * * so that his

conduct causes the market value of the interests limited after his estate for life to be diminished." Following the celebrated case of *Brokaw v. Fairchild,* 135 *Misc.* 70, 237 *N. Y. S.* 6 (*Sup. Ct.* 1929), affirmed 231 *App. Div.* 704, 245 *N. Y. S.* 402 (*1st Dep't.* 1930), affirmed 256 *N. Y.* 670, 177 *N. E.* 186 (*Ct. App.* 1931), in which a life tenant was denied the right to raze an outmoded residence capable of yielding but a slight margin above expenses and to replace it with an apartment house worth $900,000, the Law Revision Commission of New York proposed a statute which was later enacted. In its Report (1935), the Commission concluded (*p.* 405):

"* * * Certainly the owner of the future interest should be protected against a diminution of the market value of his interest or liabilities for the expenses of the proposed constructions. Within these limits the owner of the estate for life or for years should be permitted to make any alteration or replacement complying with the test of 'good husbandry.' The proposed statute is designed to meet these specifications."

The statute, applicable to estates for life and for terms of not less than five years, requires a showing among other things that the proposed alteration or replacement is one which a prudent owner of an estate in fee simple absolute would be likely to make in view of surrounding conditions and that "the proposed alteration or replacement, when completed, will not reduce the market value of the interests in such land subsequent to the estate for life or for years." *McKinney, Real Property Law,* § 537(2).

So also in other discussions of the right of a life tenant or long-term lessee to make substantial changes, the limitation is repeated that there may be no reduction in the value of the inheritance or increase in its burdens. See, for example, *Melms v. Pabst Brewing Co.,* 104 *Wis.* 7, 79 *N. W.* 738, 46 *L. R. A.* 478 (*Sup. Ct.* 1899) ; *Northern Trust Co. v. Thompson,* 336 *Ill.* 137, 168 *N. E.* 116 (*Sup. Ct.* 1929) ; *Neihuss, "Alteration or Replacement of Buildings by the Long-Term Lessee,"* 30 *Mich. L. Rev.* 386 (1932).

Prejudice to plaintiff's interests in terms of both increased burden and reduction in value is clear. The increased tax burden diminished the agreed rental yield by 36%. Equally evident is an adverse impact upon the value of the lessor's interest, since, in the light of the option to buy, the price the lessor could obtain by a present sale to others must be depressed by the inroad upon the rental income.

Hence we have no doubt that upon the present record the lessees invaded the lessor's rights and therefore should respond for the increased burden they visited upon it. The lessor's agreement to pay taxes cannot be read to embrace the impact of conduct violative of its rights.

Upon the reargument, defendant advanced the proposition that where a lessee holds an option to buy, the lessor's right to sue for waste should be suspended until it is known whether the option will be exercised, citing *Keogh v. Peak,* 316 *Ill.* 318, 147 *N. E.* 266, 38 *A. L. R.* 1151 (*Sup. Ct.* 1925), and 32 *Am. Jur., Landlord and Tenant,* § 300, *p.* 280. If that rule were accepted, still the reason for the rule, *i. e.,* that if the option is exercised the harm to the lessor will be dissipated, is absent here, since if the option is exercised, plaintiff would still be damaged to the extent of the tax payments. But, at any rate, defendant misconceives the purpose of the reference to the subject of waste. We are not here concerned with the liability of the lessees for the consequences of waste (indeed the consents given during the improvements might suffice to bar such action). We refer to the doctrine only to demonstrate the absence of any right in law to make the improvement and thus to eliminate the prop which the lessees would need to maintain their thesis that the lessor's covenant to pay taxes was intended to embrace the tax upon the improvement, thereby to avoid the liability which otherwise falls upon a lessee for taxes upon improvements made for his sole benefit.

Upon the reargument, defendant urged an estoppel on the basis of the consents executed by plaintiff during the work to meet municipal requirements. The motion for judgment having been made before answer and the issue of estoppel

not having been suggested on the motion, neither party had an opportunity to present the full story. We therefore will not now consider the issue beyond these observations: Upon the record as it now stands we see no arguable basis for an estoppel. There is no suggestion that plaintiff represented that it would bear the added tax burden and of course no evidence of any reliance upon such representation. The consents, without more, could not enlarge the tax covenant in the lease since its ambit was fixed when the lease was made. Hence, in the absence of a further agreement by the landlord at the time of the consents or representation relied upon by the lessees to their prejudice that the landlord would absorb the added tax burden, there would be no reason to withhold application of the basic rule that a lessee must bear the tax burden resulting from improvements he makes for his sole benefit.

The judgment is reversed and the matter remanded to the trial court for further proceedings not inconsistent with this opinion.

WACHENFELD, J. (dissenting). Plaintiff lessor had operated the premises in question as a laundry. Defendant lessees *initially* intended to convert them for the purpose of conducting a "quick-service" laundry. The lease was executed on October 30, 1953, but the lessees were not entitled to enter into possession until January 1, 1954. In order that the lessees might expeditiously proceed with their plans for conversion, the lease provided:

"The tenants are hereby granted permission immediately upon the execution of this lease to enter into and upon the premises for the purpose only of completing plans and making measurements in connection with the alterations which they contemplate."

The only function of the quoted clause was to enable the lessees or their agents to come upon the premises during the period between October 30, 1953 and January 1, 1954 and to define the limited purposes for which such entry might be effected.

The lease contained a typewritten insertion that the premises might be used and occupied:

"as a retail and commercial laundry, dry cleaning plant, and any other sundry and kindred enterprises which might be considered an adjunct of a laundry business, *or such other lawful purpose as the tenant or any sub-tenant may require whether related to the laundry or dry-cleaning business, or not.*" (Emphasis supplied)

This clause makes it obvious the parties either contemplated the lessees might change their minds and decide to use the premises during the term of the lease for a business other than a "quick-service" laundry or, if a specific change was not then in contemplation, that they nevertheless intended the lessees should have the right to use the premises for another business under the terms incorporated in the lease.

Did the parties intend that the lessees might make substantial alterations or improvements beyond those necessary for the establishment of a "quick-service" laundry? It is evident that they did.

A printed clause in the lease form providing that "no alterations, additions or improvements shall be made in or to the premises without the consent of the landlord in writing" was excised. Under the terms of the lease, the lessees were empowered, in their own unrestricted discretion, to devote the premises to any "lawful purpose," regardless of whether such purpose could or could not "be considered an adjunct of a laundry business." There are very few business uses, not allied to the laundry industry, which are nevertheless compatible with the organization and equipment of buildings for a laundry. Thus, it must have been realized by both the lessor and the lessees that if the lessees, as was their right, decided to go into another business, the premises might have to undergo substantial changes. Therefore, the provision requiring the landlord's permission for such changes was eliminated from the lease.

It is with this in mind that the lease clause allocating the responsibility for payment of taxes should be considered. This clause clearly and unambiguously provides:

"Landlord agrees to pay promptly municipal real estate taxes * * * and upon demand of the tenant to submit for inspection receipted bills for the same or adequate proof of payment."

One of the fundamental tenets of contract law forbids a court from rewriting a harsh agreement in order to make it comport with judicial ideals of fairness. What is sought is the intention of the parties. The meaning to them of the words they used may be clarified but new terms may not be added to an instrument unless there is proof of fraud or mutual mistake justifying reformation.

Here, the lease explicitly states that the plaintiff is to pay the real estate taxes on the property. Plaintiff's affidavit reveals that both lessor and lessees thought the premises would initially be used for a "quick-service" laundry, but nowhere does plaintiff expressly or impliedly say that at the time of the making of the contract it intended the defendants should pay any increase in taxes allocable to improvements made by them. Nor is it asserted anywhere that the defendants themselves ever entertained any such idea. In fact, what occurred was a failure to provide against a contingency which has now arisen, and not being willing to pay the penalty, the plaintiff now asks to be relieved of the unexpected burden.

"Hard cases make bad law." Nevertheless the majority refuses to uphold the contract as written and grants the relief it thinks is equitable under the circumstances, thus creating for the plaintiff a new contract foreign to the one agreed to by the parties.

If written contracts are not to be upheld as written, then contractual rights and obligations will never be stabilized and certain and the business and financial world will face chaos. Every party who makes an agreement which subsequently proves to be economically undesirable can still hope to receive judicial relief upon the theory that the unexpected development was not within the contemplation of the parties at the signing of the agreement.

The solemnity of a written contract, the cornerstone of our commercial law, is thereby jeopardized and partially

destroyed. The majority has, in my view, ventured beyond the bounds of "interpretation" or "construction" and into the realm of "creation" and "substitution."

I would affirm the summary judgment rendered below.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—Justice WACHENFELD—1.