JOHN D. KLIE and JOHN F. KLIE

*v.*

CHARLES VON BROOCK and WALTER W. WIEDERMANN.

[Filed April 30th, 1897.]

1. Upon the facts established in this case—*Held*, that the lease from the complainants to the defendants did not include the yard in the rear of the restaurant building, but covered only the right of the use of the yard for light and air.

2. The lessee rented from a third person the lot next adjoining, and to the building on it added a brick extension in the rear, the wall of which was built up to the line. In this wall were left places for a window and door opening on the yard, the intention being to open a door from the rear of the restaurant. The owner of the restaurant thereupon closed the openings left in the third person's wall by building up to the line on his side a brick wall twelve inches thick.—*Held*, that the rights of the lessee in the third lot were no greater than those of its owner, and the owner of the restaurant lot was justified in so closing the openings.

3. A lessee in possession under a lease for five years commits waste when, without the permission of the lessor, he partially destroys a party wall by cutting out an opening for a door to connect with adjoining premises, though done with the permission of the other joint owner of the wall.

4. The test in such a case is not alone whether a material injury is done to the building, but whether it is altered in a material manner and to an extent beyond what is fairly implied from the terms of the original contract of letting.

5. A person owning two adjoining and connecting buildings, in one of which he kept a saloon, let the other for a restaurant, on the express condition that no beverages should be sold there in competition with the saloon, and the lessee hired the premises adjoining the restaurant on the other side, and cut a door through the party wall to connect with the other premises, intending to open a saloon therein.—*Held*, that such action constituted waste, and that a mandatory injunction should be awarded to compel the lessee to close the door.

On bill, combined answer and cross-bill and replication.

*Mr. William S. Stuhr* and *Mr. John I. Weller*, for the complainants.

*Mr. Abel I. Smith*, for the defendants.

Klie v. Von Broock.

PITNEY, V. C.

The undisputed facts in the cause are as follows :

The complainants, prior to March, 1895, were the owners of a corner lot covered by a building, in the city of Hoboken, bounded on the north by Newark street, and on the east by River street. The building was four stories high, about thirty-six feet front on Newark street, seventy feet on River street, and had a width in the rear of forty-two and a half feet from River street. The increased width in the rear is due to an offset of six and a half feet in the west side line at a distance of thirty-three feet from Newark street; the side lines being parallel to each other. The first floor was used by them as a liquor saloon, and the other floors as an apartment-house.

The legal title to the lot adjoining the foregoing, on the west, and fronting on Newark street, was at that time held by the Hoboken Land and Improvement Company, subject to a contract to purchase from that company held by Messrs. Ernst and August Scheland, and there was a small building upon it, as I infer, one story in height. Late in February, 1895, the defendant Von Broock purchased this contract from the Schelands for $13,250, and immediately assigned it to the complainants for the same consideration. That lot was twenty-eight feet two inches in front, seventy feet deep, and twenty-one feet and six inches in width in the rear, fitting in, on the east side, to the offset above mentioned in the west line of the complainants' corner lot. This lot was known as No. 35 Newark street.

On the west of it was a lot known as No. 39 Newark street, also owned by the Hoboken Land and Improvement Company, upon which was erected a four-story building, and between Nos. 39 and 35 was a twelve-inch brick party wall extending back about thirty-five or forty feet. On the rear of No. 39 was a wooden extension ten or twelve feet high, to the full depth of the lot, and abutting on the easterly line, without any openings toward No. 35, and forming a fence or division between the two lots. The rear of these lots abutted on the blank wall of a theatre. Immediately after the complainants became the as-

signees of the contract for No. 35, they removed the old build-
ing and commenced the erection of a one-story building with
basement upon it.

There was an understanding from the first between complain-
ants and the defendant Von Broock that Von Broock should
have a lease of the new building for a restaurant; he was con-
sulted with regard to the interior arrangement of it, and his
wishes followed in some of its details. Before it was finished,
to wit, on the 14th of June, 1895, the complainants and defend-
ants entered into a written lease and agreement as follows:

"Witnesseth: That the said parties of the first part have hereby let and
rented to the said parties of the second part, and the said parties of the second
part have hereby hired and taken from the said parties of the first part, all
that certain store, basement and vault now in course of erection on that cer-
tain lot of land and premises situate on the southerly line of Newark street in
the city of Hoboken, Hudson county, New Jersey, particularly mentioned and
described in a certain agreement dated September twenty-fourth, eighteen
hundred and eighty-three, and made between the Hoboken Land and Improve-
ment Co. and William Hersee, and recorded January 17th, 1889, in Book 17
of Miscellaneous Records for said Hudson county, on page 367, and assigned
on the 19th day of June, 1894, by the said William Hersee to Ernst Schellan
and August Schellan, and by the said Ernst Schellan and August Schellan to
Charles Von Broock, by assignment dated March 4, 1895, and by the said
Charles Von Broock assigned to said John D. Klie and John F. Klie, by
assignment dated March 4, 1895, and recorded &c., as by reference to said
agreement and assignments will fully appear, and known as premises street
number 35 Newark street, Hoboken, New Jersey;

"Excepting and reserving to the parties of the first part the right to use, in
connection with their business, the ladies toilet-room in said leased premises,
in common with the said parties of the second part, during the hours that said
leased premises are kept open by said parties of the second part for business
purposes;

"For the term of five years, to commence on the first day of August, 1895,
at the yearly rent of $1,200.     *   *   *

"And the said parties of the second part covenant that they will not, during
said term, sell upon said leased premises, or offer for sale thereon, or give, in
connection with their business or otherwise, with or without consideration,
any vinous, spirituous or malt liquors or any ale or lager beer, under penalty
of forfeiture of this lease or the term of said parties of the second part there-
under.

"And the said parties of the second part further agree that they will not,
during said term, sell or offer for sale any cigars on said premises excepting
such as they may purchase for the purpose of such sale from said parties of

the first part, and which the said parties of the first part agree to sell and furnish to said parties of the second part at the cost price of the same to said parties of the first part and a profit thereon of ten dollars a thousand, on all such brands of cigars as are or shall, during said term, be sold by said parties of the first part in their premises adjoining said leased premises for ten cents apiece, and a profit of five dollars a thousand on all such brands of cigars as are now, or may during said term, be sold by said parties of the first part for five cents apiece.

" This lease is made and accepted on the following express conditions:

" *First.* That in case the parties of the second part shall, during said term, sell upon said leased premises, or offer for sale thereon, or give away in connection with their business or otherwise, with or without consideration, any vinous, spirituous or malt liquors or any ale or lager beer, or

" *Second.* In case the said parties of the second part shall assign this lease or underlet the said premises or any part thereof, without the written consent of the parties of the first part,

" That then, in either of said events, the parties of the first part, their heirs or assigns, in their option, shall have the power and the right of terminating and ending this lease immediately, and be entitled to the immediate possession of said premises, and to take summary proceedings against the parties of the second part or any person or persons in possession as tenant having had due and legal notice to quit and surrender the premises holding over their term." * * *

The building was erected according to plans and specifications, under the supervision of an architect, and the lessees undoubtedly knew, when they signed the lease, just what the building would be when finished. It covered the whole lot from the front to within about ten feet of the rear. From that point a projection extended about six feet further—that is, to within four feet of the rear, but to the width of only about twelve feet, leaving on each side an open space of about five or six feet, which was excavated to nearly the depth of the basement and walled in with brick walls a little higher than the earth, thus making an ordinary window area, with a sink in the bottom to carry off rain water. Besides these two window areas there was left a clear strip of open yard about four feet wide, extending across the whole width of the lot. The object of this was to afford light and air to the basement of the new building, and also to leave light and air for the westerly side of the main floor and basement of the rear of the four-story corner building.

In building on this lot the complainants made use of the party

wall between No. 35 and No. 39 as far to the rear as it reached, and then built an independent wall on their own side of the line as far as the main body of the building, which, as we have seen, is ten feet from the rear of the line.

Upon each of the two areas two windows opened from the basement—one upon each from the main building, and one upon each on the side of the rear extension. There was no door leading into the back yard or areas.

The rear basement was used as a kitchen, the range being on the west. On the main floor was a gentlemen's toilet-room on the west side, and a ladies' toilet-room on the east side adjoining the complainants' liquor saloon, and there was an open doorway connection with the complainants' saloon, so that persons could pass freely from one to the other.

The restaurant was finished in August, 1895, and the defendants immediately took possession and have since occupied it for their business.

By the permission of complainants the defendants, in the fall of 1895, enclosed the easterly area and placed in it their ice-box and refrigerator.

In the spring of 1896 the defendants conceived the idea of enlarging their business, and rented from the Hoboken Land and Improvement Company the premises adjoining on the west (No. 39) and immediately commenced to alter them and fit them up for a restaurant. In doing this they tore down the wooden building in the rear which had formed a dividing barrier between Nos. 39 and 35, and erected a one-story brick building in its place, with the side wall placed, or intended so to be, up to the line of the Hoboken Land and Improvement Company's land, and left in this wall two open spaces on the side next to No. 35—one a window opening upon the west area of No. 35, and another a door opening upon the main yard. The object of this door was to make a passageway from No. 39 to the kitchen of No. 35, and with this view they tore out the window looking from the kitchen upon the west area, and prepared to make a door in its place by enlarging the opening.

Complainants being apprised of this project protested and for-

bade it, and made use of a window which opened from the rear of the corner lot occupied by them upon the yard of No. 35 to gain access thereto, for the purpose of building a brick wall as a hoarding or barrier on the rear of the westerly line of No. 35, and thus shut up the window and door so proposed to be opened upon their lot from No. 39. In this attempt, made on Saturday, May 9th, they were forcibly resisted by the defendants. At about the same time they heard that the defendants were about to break through the party wall between No. 35 and No. 39, in the basement, and make a passageway between the two premises. They thereupon prepared their bill in this cause, and presented it to a vice chancellor on the afternoon of May 11th, setting out their title to the two lots, the lease to the defendants, and most of the facts hereinbefore stated, and praying an injunction against the breaking through of the party wall in the basement, and also against interference with their entry upon the yard in the rear of No. 35 to erect a brick hoarding against the door and window opening upon their premises from No. 39.

A restraining order was granted, but before it was granted or served the defendants had succeeded, by employing laborers on Saturday evening, May 9th, to work that night and the next day, Sunday, in cutting an opening in the party wall, and constructing a door and passageway therein between the two buildings.

Under the protection of the restraining order the complainants gained access to the enclosed yard in question from the window in the rear of their corner building, and erected a solid brick wall twelve inches wide, and about twelve or fourteen feet high, close up to their westerly line, partly upon a new foundation, and partly upon the stone coping of the area wall of the westerly rear area, the result of which was to prevent the defendants from using the door and window which they had left in the wall of the new building on the Hoboken Land and Improvement Company's land, but to leave them the use of the passageway resulting from the breaking through of the party wall. The defendants subsequently partially restored the window in the basement,

and inserted in it a ventilator operated by electricity to cool the air of the kitchen.

The defendants, by their cross-bill, pray that the complainants may be decreed to abate and take down this wall in the rear. Complainants pray that the defendants may be restrained from using the passageway in the party wall, and may be decreed to fill it up and restore it to its former condition.

The questions litigated are:

*First.* Did the lease from the complainants to the defendants include the yard in the rear of the restaurant, or did it cover only the right of the use of the yard for light and air?

*Second.* Were the complainants justified in building the brick hoarding or barrier on the west side of the rear of lot No. 35?

*Third.* Was the breaking through of the party wall and inserting a door in the basement, waste on the part of the defendants? And, if so, then

*Fourth.* Should the defendants be ordered to restore it?

I think the first question must be resolved in favor of the complainants. The construction of the clause of demise in the lease is not free from difficulty, but it seems to me that the better view is that the thing demised was the building itself as it stood, and not the yard in the rear. If the parties intended to include in the letting the whole lot, it would have been easy to express that intention in a few words. And the express mention of the building is an indication that nothing more was intended to be demised. The word " on " in the first part of the clause cannot be read as " and."

Then the plan of the building must be considered. There were no doors opening upon the little yard, and the only means of access to it were ordinary windows, and such do not indicate any intention that they should be used as doors in order to gain access to the yard, but the contrary. And, in fact, the yard was capable of little or no actual occupation or use.

Then, again, complainants would naturally desire to keep it free from obstructions to light and air for their corner lot, and free from any objects which might in any degree annoy their customers or tenants.

Stress was laid by defendants' counsel on the last clause of the described premises, namely, "and known as premises street number 35 Newark street." But clearly these words, by correct grammatical construction, refer to the preceding description of the lot on which the building demised was in course of construction, and not to the thing demised.

Further, I am unable to distinguish between the two little areas and the remainder of the uncovered space. They are simply depressions in the earth, made to give light and air to the basement, and the rain-water sinks in their bottoms indicate that they were not constructed or intended as a part of the building so as to pass with it.

My conclusion is that the only right in this yard which the defendants acquired by their lease was the right of light and air, and this right flowed from the fact that the building demised to them was provided with windows opening upon it.

Second, as to the right of the complainants to erect the brick wall intended as a hoarding or screen to obstruct the newly-constructed door and window which opened into this yard and area from No. 39.

This question must be considered precisely as if that work had been done by the Hoboken Land and Improvement Company itself, and the defendants were not tenants of that building, for I cannot see that the defendants have the right to add their right as lessees of No. 39 to that as lessees of No. 35, or stand in any better light before the court on this part of the case than would their landlord of No. 39. There can be no doubt of the right of an owner of a vacant lot to erect a screen or hoarding on his own premises in order to prevent his neighbor, who builds up to the line between them and places windows in his building looking upon his neighbor's ground, making use of them for that purpose. In fact, it is not an uncommon occurrence and quite a natural and proper thing to be done by the person whose vacant land is about to be subjected to such a use by his neighbor.

The precise question here is narrowed down to this: Whether or not the erection of the hoarding in this case was an actual in-

fringement of the right of the defendants to the light and air of the yard in the rear of their restaurant on No. 35. It did, in a very slight degree, tend to reduce the light which entered their basement windows by narrowing, by one foot, the width, or rather, shortening the length of the open space or yard in the rear of their building. But the defendants brought this slight injury upon themselves by attempting to make a use of the yard which was certainly not within the letter of their contract, and clearly not within the contemplation of the parties when the lease was made, and I think that unjustifiable attempt prevents them from complaining of the adoption by complainants of the only efficient means they had to prevent a misuse of the premises.

Besides, the matter of light in the rear of the demised premises has, by the voluntary act of the defendants, become of slight importance. The window opening from the basement of the main building upon the westerly area has been devoted to the purposes of ventilation and not of light, and the whole of the projection from the main building has been shut off from the basement by a temporary wooden partition, and the projection itself is used simply for a spiral stairway from the main floor of the restaurant to the kitchen. The eastern window of the main building has been stopped by the placing of a refrigerator therein. The kitchen itself is lighted entirely by gas.

There remains the third question, namely, that of waste.

The defendants obtained permission from the Hoboken Land and Improvement Company to cut the doorway through the partition wall, but, clearly, that company could not give them the right to do so without the permission of the complainants, who owned one-half of the wall. And the result is the same whether we consider that ownership as of the particular one-half which was on their side of the line or as the undivided one-half of the whole. The question, then, is whether or not, under the terms of the lease, the defendants acquired such a right in the premises as authorized them to make the opening.

The opening, as first made, was between four and five feet wide and seven or eight feet high. The bricks and mortar were

actually removed, and these composed an essential part of the building itself.

Now, it seems to me too plain for argument that such an abstraction amounted to waste at the common law. It was a "spoil" and "destruction," *pro tanto*, of the building. *2 Bouv. Law Dict. tit. "Waste;" 6 Jac. Law Dict. tit. "Waste" 393* (at *p. 399*), where the author uses this language, citing authorities :

"If a lessee flings down a wall between a parlor and a chamber, by which he makes a parlor more large, it is waste; it cannot be intended for the benefit of the lessor, nor is it in the power of the lessee to transpose a house. So, if he pulls down a partition between chamber and chamber, it is waste. Or, if a lessee pulls down a hall or parlor and makes a stable of it, it is waste. If a lessee pulls down a garret overhead, and makes it all in one and the same thing, it is waste. Breaking of a wall covered with thatch, and of a pale of timber covered, is waste."

To the same effect precisely are *7 Bac. Abr. tit. "Waste"* (at *p \*256*) and *Tayl. Land. & T.* § *348; Kerr. Inj. \*250, \*251,* where the author says :

"An alteration of buildings which changes their nature and character is waste, even although the value of the premises be thereby increased. Thus, the converting two chambers into one, or *e converso*, or the converting a hand-mill into a horse-mill, or a corn-mill into a fulling-mill, or a malt-mill to a corn-mill, or a logwood-mill to a cotton-mill, have been held to be waste. So, also, the conversion of a private house into a shop is waste. So, also, may the building of a new house where there was one before be waste if it impair the evidence of title."

And he cites Lord Romilly, in *Smith* v. *Carter, 18 Beav. 78,* for authority that a tenant will be restrained from pulling down a house and building another, which the landlord objected to. "It is not sufficient," said his lordship, "that the house proposed to be built is a better one. The landlord has a right to exercise his own judgment and caprice whether there shall be a change; if he objects the court will not allow a tenant to pull down one house and build another in its place."

And see *1 Washb. Real. Prop. \*113,* where the learned author adopts the rule as laid down by Lord Romilly.

This restriction on the right of a tenant for years is based upon the character of his tenancy. "He has the use, but not the dominion of the property." *Farrant* v. *Thompson, 5 Barn. & Ald. 826,* per Mr. Justice Holroyd.

Evidence was given as to whether or not the destruction in this case materially injured the party wall. I think that the weight of the evidence is that it did materially injure it. The wall itself, being only twelve inches in thickness, was, at best, a very slight affair to maintain a four-story building; so much so, that it will, sooner or later, require a shoring on each side. Now it seems to be contrary to common knowledge and common sense to say that taking out and absolutely abstracting a piece of the wall four or five feet wide and seven or eight feet high, will not weaken it, and materially weaken it. A contrary view would result in holding that several such openings could be made in this wall without injuring the building.

Then the evidence satisfies me that the attempt to properly secure and support the wall over the opening was not well carried out, and was not successful. New jambs of brick were added to the ragged edges of the opening, in order to make it square and proper to be stopped by doors. Those jambs, being of new material, required the greatest care in their construction in order to make them unite and be homogeneous with the old work, but the complainants' architect swears that upon an inspection made during the hearing he found a crack and opening between the new and the old work. Then iron beams or lintels were placed upon these new jambs to sustain the weight of the wall above. The architect in question gave it as his opinion—and I agree with him—that the proper mode of sustaining those lintels was to place them upon iron plates, placed in turn upon the top of the old part of the wall on each side, and then to key them up with iron wedges so as to make them bear up and press against the old brick work. Instead of this, they were simply laid upon the bare bricks of the new jambs, which, as we have seen, were, from defective construction, insufficient for that purpose. The result of this mode of adjusting them was to render them substantially useless so far as regards preventing any subsidence in

Klie *v.* Von Broock.

the wall above the opening.  The architects called by the de-
fendants swear that the opening was made in the usual manner,
and well done.  But I cannot accept their judgments on this
subject.  It seems to me they are not sound.

But, in my judgment, the test in such a case is not alone
whether a material injury is done to the building, but whether
it is altered in a material manner, and to an extent beyond what
is fairly implied from the terms of the original contract of letting.

It is said by the treatise-writers, and authorities are cited for
the position, that the severity of the ancient rule of waste has
been relaxed, and that many alterations are now held not waste
which in ancient times would have been held as waste.  I have
examined the cases which are said to illustrate this modification,
and my conclusion is that in most of them a permission by the
owner to the tenant to alter and change the building is either
found in the terms of the demise, or is to be implied from the
circumstances of the case.  Thus, if the owner of a dwelling in
a neighborhood which is rapidly being converted from a dwelling
region into a business region, lets it to a party for a long term
of years, knowing that he expects to use it for business purposes,
that, by implication, is permission to him to make such altera-
tions as are necessary and usual for that purpose.  And so where
a demise is made for a great number of years—say one hundred
or two hundred—for a fair rental value of the premises, there
it must be presumed that the parties intended that the tenant for
years should have well-nigh unrestricted use of the premises,
provided he does not reduce their rental value.  For, in such a
case, the reversion, independent of the rent, is of mere nominal
value.

So, I should say that if a building be erected and let for a
hotel, and through oversight or miscalculation some mistake in
the interior arrangements occurs which materially interferes with
its beneficial use for that purpose, and requires a change, it is
probable that the right to make such change could properly be
inferred from the circumstances.  An illustration is found in
this case.  At the special request of the tenants the landlords
divided the basement into two parts by a cross-wall of brick,

not a part of the original plan and not necessary for the support of the building. This was done in order to keep the heat of the range in the kitchen from penetrating to the front part of the basement. When the building came into actual use it was found that this wall was an injury rather than a benefit, and was in whole or in part removed by the defendants. They assert that it was done with the consent of the landlords; but the landlords deny this. Be that as it may, I think it was not waste, and its removal was not relied upon as a part of complainants' case.

The cases in this country relied upon to show an amelioration of the strict English rule are *Jackson* v. *Tibbits, 3 Wend. 341,* and *Winship* v. *Pitts, 3 Paige 259.*

*Jackson* v. *Tibbits* was an ejectment by landlord against tenant, based upon waste committed by the tenant in the leased premises, which were a tavern in the village of Utica, and the waste was the cutting a door between two rooms in the second story, and putting a window in the door of the cellar kitchen. It appeared that they were beneficial, and not injurious, to the premises. The judge, at the trial, charged the jury that they amounted to waste and worked a forfeiture of the defendants' rights in all the premises. There was evidence, however, of waiver by the plaintiff of the waste. The opinion was *per curiam,* by Mr. Justice Marcy, and he granted a new trial, not only on the ground that the act committed was not waste, but also that, according to the authorities, the whole premises were not forfeited, but only the part wasted; and further, that there was proof from which the jury might have inferred a waiver. Of course, in considering the effect of this case, and others like it, we must bear in mind that the courts are always anxious to save an actual forfeiture of the term.

*Winship* v. *Pitts, supra,* was decided by Chancellor Walworth. There a tenant of a corner lot, which had vacant land in the rear abutting on a side street, proposed to erect a stable there, and the landlord, owning other property in the neighborhood, filed a bill for an injunction. The chancellor held that the mere erection of a stable on vacant land was not waste. In fact, it never

was waste; a *dictum* to the contrary by Lord Coke was very shortly afterward overruled.

After a full review of all the cases in both countries, Professor Dwight, sitting in the commission of appeals, in *Agate* v. *Lowenbein, 57 N. Y. 604,* declares that "there can be no pretence of any relaxation of the rule against waste in the case of tearing down houses or taking away inner walls or partitions. It would be difficult to set any limits to such acts by judicial decisions. Where such changes are desired they should be left to the agreement of the parties." In this view I heartily concur.

Then there is a distinction taken by the judges between an alteration in the outside walls of a building forming a property boundary and those more trifling alterations which may be made in the interior partitions—taking away or cutting a door through an interior partition or altering a street window into a door. As late as 1817 Lord Ellenborough, after hearing the most distinguished counsel of the day, held that the cutting of a doorway through the outside wall of a demised house into an adjoining house and keeping it open for a long space of time, amounted to a breach of a covenant to repair, which was a continuing breach, and which caused a forfeiture and entitled the landlord to recover in an action of ejectment against his tenant. *Doe, ex dem. Vickrey,* v. *Jackson, 2 Stark. *260.*

In *Doe* v. *Jones, 4 B. & Ad. 126,* attempt was made to forfeit a lease on account of a breach of covenant to repair. The term was for forty years, and the lease contained a covenant to keep in repair the premises "and all such buildings, improvements and additions as shall be made by the lessee during the term," with a proviso for re-entry in case of breach. The lessee changed the lower windows opening on the street, and stopped up a doorway, making a new one in a different place in an interior partition of the house, and it was held that there was no waste because it appeared that the changes were not injurious and were contemplated by the language of the lease. *Doe* v. *Jackson, supra,* was cited, but the judges distinguished it on the ground that in that case the breaking was of a wall between two houses, and not in an interior partition of the house.

*Young* v. *Spencer, 10 B. & C. 145,* was an action on the case by landlord against tenant for injury to the leased premises. It appeared that the defendant had opened a door from the house into the street, and the jury found specially that no injury was done to the house itself or to any of the other houses owned by the plaintiff on that street. The judge directed a judgment for the plaintiff, but the court held that it was for the jury to say whether there was any injury to the plaintiff's reversionary right, and granted a new trial.

Some of the authorities cited by the defendants' counsel were cases of equitable waste, and so not applicable here; the distinction being that equitable waste is an abuse by a tenant, without impeachment of waste, of his legal right to commit waste.

I can find no authority holding that a breach in and partial destruction of a wall dividing the demised premises from those adjoining owned by another party is not waste.

In the present instance there can be no pretence that the right to make such a breach can be implied from anything contained in the contract or found in the circumstances surrounding its inception and conclusion. The building was designed especially for a restaurant, to be used in connection with the complainants' liquor saloon, and the defendants were consulted and knew and agreed to all the details of its construction. Indeed, in their answer they claim a greater voice in those details than the complainants admit. It was not contended that, as constructed, it did not answer the expectation of the parties. There was and can be no pretence that the change effected by the opening in question tends to make the building more convenient for the use for which it was designed and leased.

These considerations lead to the conclusion that the case is not covered by any well-considered authority in which tenants have been held justified in changes of this character.

Fourth, as to the remedy.

In the prayer of complainants' bill they ask that the defendants may be ordered either to restore the opening in the party wall, or to give security for its restoration at the end of the term. By thus praying for alternative relief I understand that the

complainants did not intend to give to the defendants an option of submitting to the latter remedy, but simply to ask that the court should give it if the first remedy of immediate restoration was not considered by the court proper and equitable. The defendants, by their answer, and at the hearing, offered to give security for restoration at the end of the term, but complainants at the hearing insisted upon immediate restoration.

It is well settled that complainants are entitled to immediate relief, and are not obliged to wait until the end of the term. *Agate* v. *Lowenbein, 57 N. Y. 604,* and cases cited at *p. 612 et seq.*

In the present case the waste was committed against the known wishes and protest of complainants, and with such haste that it was substantially completed before complainants could obtain preventive relief from this court.

It further sufficiently appears that the carrying out of defendants' plan will be inconsistent with the spirit, if not the letter, of the agreement. The intention was that the restaurant should be conducted in such a manner as to increase the patronage of complainants' liquor saloon, and should not be in any sense a competitor for their business. The complainants allege in their bill that the intention of defendants is to keep a rival liquor saloon in No. 39. This is not denied by defendants in their answer. In fact, they say they propose to keep an hotel there. If so, and a passageway is kept open between the two buildings, patrons of the restaurant in No. 35 may possibly be served with intoxicants from a bar in No. 39 without a breach of the letter of the agreement. This consideration shows the motive, or one of the motives, behind complainants' action, and it cannot be affirmed that it is unworthy or inequitable.

In the somewhat similar case of *Bonnett* v. *Sadler, 14 Ves. *526,* Lord Eldon did not think it inequitable. In that case the complainants were the proprietors of a carriage factory and salesroom, and owned an adjoining house, which was a dwelling. The defendants leased the dwelling, concealing from the complainants the fact that they intended to set up a rival establishment, and after getting possession proceeded to change the front

and interior of the building so as to make it fit for that purpose, and Lord Eldon remarked upon their conduct in that respect as inequitable. And Lord Selborne, in *Goodson* v. *Richardson*, *L. R. 9 Ch. App. 221 (1874)* (at *p. 224*), spoke approvingly of a landowner, who was interested in a water company, standing on his strict rights in equity to prevent a rival company from laying its water mains in the street in front of his lands.

The presumption is that the restriction against selling liquors contained in the lease affected the amount of the rent. At all events, the complainants are entitled to the benefit of their contract, and are justified in using all legal means to preserve it.

For these reasons complainants, in my judgment, have a clear right to relief in this court.

The authorities justify the use of a mandatory injunction in such cases. The leading case is *Vane* v. *Lord Barnard, 2 Vern. 738,* known as the *Raby Castle Case*. This was followed by *Rolt* v. *Lord Somerville (1737)*, decided by Lord Hardwicke and reported in *3 Eq. Cas. Abr.* (at *p. 759*), where there was a cutting of trees and also pulling down houses and buildings. The prayer was that the premises might be restored. Lord Hardwicke said that he could not compel the restoration of the trees, but he said, " yet, as to the pulling down the houses and buildings and laying the lead pipes they may be restored or put in as good condition again," citing with approbation the case of *Vane* v. *Lord Barnard*.

I think the present a proper case for immediate restoration.

I will advise a decree that the defendants be restrained from permitting the opening in the party wall, made by them on or about May 10th, 1896, to remain in its present condition, or from permitting the party wall between the leased premises and those of the Hoboken Land and Improvement Company on the west, to be in any other condition than it was prior to the opening made therein by the defendants ; and further, if complainants desire themselves to do the work of restoration, then that the defendants be restrained from preventing the complainants from so doing, at a reasonable time and in a reasonable manner, and the court will name a special master, under whose super-

vision the work of restoration shall be done, if the parties cannot agree thereupon. The provision for restoration may also include the window opening upon the area, if the brickwork has not already been restored to its original condition.