The complainant conducts a department store in the City of Trenton. The stock ownership of the defendant is shared by The First-Mechanics National Bank and The Trenton Banking Company, two banking institutions. The transaction between these parties from which the present dissension has ensued is exhibited by a written lease, dated June 15th, 1934, actually executed on December 26th, 1934, whereby the defendant demised to the complainant for a term of eighteen years, subject to stated provisions, certain premises identified as Nos. 11 and 13 North Broad Street and Nos. 24 and 26 East State Street, in Trenton. The contiguous properties on North Broad Street and those on East State Street unite astern at right angles. Thus they are capable of forming a unit for business utility with entrances available on each street.
The defendant did not have a plenary title to all the interests and estates in the premises known as No. 24 East State Street. Its right to possession was in part derived from a leasehold estate in an outstanding undivided interest and the term of that tenancy would terminate on June 14th, 1940. This circumstance has increased in significance. The inability or failure of the defendant to obtain an adequate extension of its own leasehold estate in No. 24 has been a generating cause of anxiety and complications. That eventuality, however, was not unforeseen. The lease between the complainant and the defendant contains the following relevant provision:
"It is understood and agreed between the parties hereto as a condition and term hereof that in the event the Landlord is unable to negotiate a lease for the whole of said property, namely, No. 24 East State Street, Trenton, New Jersey, for the period commencing June 15, 1940, and ending June 14, 1952, the date of the termination of this lease, with the respective owners of the undivided interests in the said property, at the same rental and on the same terms as are now contained in the lease between the Landlord and the present owners of the undivided interests in said property, that this lease shall terminate as to 24, East State Street only at midnight on June *Page 239 
14, 1940, and as to that property only shall be null and void, and the term and estate hereby granted as to said property only and all rights hereunder of the Tenant in said property shall cease, end and expire, and that the annual rental for the then balance of the term of this lease for the remaining property covered by this lease shall be reduced by the sum of $5,050.00 to be applied as monthly credits of $420.83 each month to the amount to be paid by the Tenant, as required by Par. (g) of Section 2."
Expedients were employed which enabled the complainant to continue its occupancy of No. 24, principally as a tenant of the defendant, until October 1st, 1942. However, in April, 1941, the stockholders of the complainant organized a corporation entitled "Audrey-Paul, Inc.," and in June of that year it acquired by purchase the premises No. 15 North Broad Street which are in contact with No. 13. The incidental events are that financial aid in the acquisition of that property was granted by the Mechanics Bank, and on or about June 20th, 1941, the complainant with the consent of the defendant made passageways between Nos. 13 and 15 on the second, third and fourth floors of the buildings. A tenant in nowise associated with the complainant retains possession of the first floor of No. 15 and access to the upper floors is had only through the demised premises.
In the summer of 1942 a decree in a partition suit necessitated a public sale of No. 24 East State Street at which the title to the premises was acquired by a corporation known as Doherty, Inc. In September, 1942, the defendant having declined to lease No. 24 and to sublet it to the complainant, the latter leased that property from Doherty, Inc., for a term of two years from October 1st, 1942, at an annual rental of $8,500 plus any eventual increase, during the term, of real estate taxes thereon above those levied for the year 1942. On October 18th, 1941, the complainant established its toy and domestic departments (previously located on the first floor of No. 26 East State Street) on the second floor of No. 15 North Broad Street.
Amid these factual circumstances, the parties experience a diversity of opinion concerning the amount of rent payable by the complainant to the defendant pursuant to the covenants of the lease. *Page 240 
The covenants are transcribed as follows:
"(a) For the period from June 15, 1934 to June 30, 1934, the sum of Eight hundred thirty-three dollars and thirty-three cents ($833.33).
"(b) For the period from July 1, 1934, to June 30, 1936, a sum equal to four (4%) per centum of the `gross sales' (as hereinafter defined), of the Tenant during such period on the aforesaid described premises; excepting, however, that in the event that the rental computed as aforesaid shall for any yearly period or rent year be less than Twenty thousand ($20,000) dollars, the Tenant shall pay to the Landlord the said sum of Twenty thousand ($20,000) dollars for each of said annual periods or rent years, said sum of Twenty thousand ($20,000) dollars being hereby fixed as the minimum rental for each of said yearly periods or rent years.
"(c) For the period from July 1, 1936 to June 30, 1939, a sum equal to four (4%) per centum of the `gross sales' (as hereinafter defined), of the Tenant during such period on the aforesaid described premises; excepting, however, that in the event that the rental computed as aforesaid shall for any yearly period or rent year be less than Twenty-three thousand ($23,000) dollars, the Tenant shall pay to the Landlord the said sum of Twenty-three thousand ($23,000) dollars for each of said annual periods or rent years, said sum of Twenty-three thousand ($23,000) dollars being hereby fixed as the minimum rental for each of said yearly periods or rent years.
"(d) For each of the annual periods or rent years beginning with July 1, of each year and ending June 30, of the following year, commencing with the year 1939, to and including the year 1952, and up to June 14, 1952 (midnight), a sum equal to four (4%) per centum of the `gross sales' (as hereinafter defined), of the Tenant during said period on the aforesaid described premises; excepting, however, that in the event that the rental computed as aforesaid for any annual period or rent year of said period be less than Twenty-six thousand ($26,000) dollars, the Tenant shall pay to the Landlord the said sum of Twenty-six thousand ($26,000) dollars for each of said annual periods or rent years, said sum of Twenty-six thousand ($26,000) dollars being hereby fixed as the minimum rental for each of said yearly periods or rent years. For the period from June 1, 1952, to June 14, 1952 (midnight), the Tenant shall pay to the Landlord a sum equal to four (4%) per centum of the `gross sales' of the Tenant during that period, excepting, however, that in the event that the rental so computed be less than One thousand eighty-three dollars and thirty-three cents ($1,083.33), the Tenant shall pay to the Landlord the said sum of One thousand eighty-three dollars and thirty-three cents ($1,083.33).
"(e) On the 10th day of August 1934, the Tenant shall pay to the Landlord four (4%) per centum of the `gross sales' for the preceding rent month from July 1, 1934 to July 31, 1934, unless such sum shall be less than one-twelfth of $20,000, or $1,666.66, in which event the Tenant shall pay a minimum of $1,666.66. On the 10th day of each succeeding month during the rent year from July 1, 1934, to June *Page 241 
30th, 1935, and similarly for the rent year from July 1st, 1935, to June 30th, 1936, the Tenant shall pay to the Landlord for the preceding rent month such a sum as, added to the sum or sums previously paid during the rent year, will cause the total rent paid at the end of any rent month within the rent year to equal 4% of the accumulated gross sales during said rent months, provided that if such total rent thus paid should be less than the prescribed minimum of $1,666.66 per rent month, in that event the Tenant shall pay such a sum as shall be necessary to make the total rent paid equal to the total prescribed minimum rent for the number of rent months of the rent year which have expired. Simultaneously with the payment made on the 10th of each month, the Tenant shall furnish to the Landlord a statement of the gross sales (as hereinafter defined) made on the aforementioned premises for the period covered by the payment, duly certified and attested by the Treasurer of the Tenant.
"(f) On the 10th day of August 1936, the Tenant shall pay to the Landlord 4% of the gross sales for the preceding rent month from July 1st, 1936 to July 31st, 1936, unless such sum shall be less than one-twelfth of $23,000, or $1,916.66, in which event the Tenant shall pay a minimum of $1,916.66. On the 10th day of each succeeding month during the rent year from July 1st, 1936 to June 30th, 1937, and similarly for the rent years from July 1, 1937 to June 30th, 1939, the Tenant shall pay to the Landlord for the preceding rent month, such a sum as, added to the sum or sums previously paid during the rent year, will cause the total rent paid at the end of any rent month within the rent year to equal 4% of the accumulated gross sales during said rent months, provided that if such total rent, thus paid, should be less than the prescribed minimum of $1,916.66 per rent month, in that event the Tenant shall pay such a sum as shall be necessary to make the total rent paid equal to the total prescribed minimum rent for the number of rent months of the rent year which have expired. Simultaneously with the payment made on the 10th of each month, the Tenant shall furnish to the Landlord a statement of the gross sales (as hereinafter defined) made on the aforementioned premises for the period covered by the payment duly certified and attested by the Treasurer of the Tenant.
"(g) On the 10th day of August 1939, the Tenant shall pay to the Landlord 4% of the gross sales for the preceding rent month from July 1st, 1939 to July 31st, 1939, unless such sum shall be less than one-twelfth of $26,000, or $2,166.66, in which event the Tenant shall pay a minimum of $2,166.66. On the 10th day of each succeeding month during the rent year from July 1st, 1939 to June 30, 1940, and similarly for the rent years from July 1, 1940 to June 15, 1952, the Tenant shall pay to the Landlord for the preceding rent month such a sum as, added to the sum or sums previously paid during the rent year, will cause the total rent paid at the end of any rent month within the rent year to equal 4% of the accumulated gross sales during said rent months, provided that if such total rent, thus paid, should be less than the prescribed minimum of $2,166.66 per rent month, in that event the tenant shall pay such a sum as shall be necessary *Page 242 
to make the total rent paid equal to the total prescribed minimum rent for the number of rent months of the rent year which have expired. Simultaneously with the payment made on the 10th of each month, the Tenant shall furnish to the Landlord a statement of the gross sales (as hereinafter defined) made on the aforementioned premises for the period covered by the payment, duly certified and attested by the Treasurer of the Tenant. If there shall be no renewal of the leases of the Landlord's interest in No. 24 East State Street to the 26 East State Street Realty Company after their expiration on June 14, 1940, or if said leases be otherwise terminated as hereinafter provided in Section 6, Paragraph (e), then there shall be a reduction in rent for the rent years from June 15, 1940 to June 15, 1952 in accordance with the provisions set forth in Section 6, Paragraph (e), page 13 of this Indenture.
"3. `GROSS SALES,' for the purpose of determining the amount of rental, as hereinbefore specified, is hereby defined as the total gross selling price of all merchandise sold and the selling price of all service rendered on and/or from and/or in connection with the aforesaid department store premises, less the selling price of goods returned by any customer, if such selling price of goods returned by customers has been included in the `gross sales' during the term of the lease, and further less any unpaid balances on any merchandise sold on instalment if such selling price of goods has been included in the `gross sales,' and further less any discounts or allowances given to any customers, if such discounts and allowances have been included in the `gross sales' during the term of the lease, and further less the amount of any sales or other tax, imposed by any governmental authority, added to the purchase price paid or charged to the customer, which shall have been included as part of the `gross sales' during the term of the lease."
Succinctly stated, the defendant insists that under the terms of the lease, it is entitled to 4% of the gross sales of merchandise made by the complainant at No. 15 North Broad Street, the premises purchased by Audrey-Paul, Inc., and at No. 24 East State Street, leased by complainant from Doherty, Inc., in that such sales are made "in connection with" the premises originally demised.
In June, 1942, the defendant instituted an action in the Mercer County Circuit Court to obtain a declaratory judgment of its right to receive the percentage of those gross sales. The jurisdiction of the court was impugned and the complaint was stricken. The defendant thereafter threatened to dispossess the complainant and demanded that the openings between Nos. 13 and 15 North Broad Street be closed.
The bill of complaint is designed to embrace three alleged *Page 243 
causes of action: (a) a construction of the lease, or alternatively (b) its reformation, and (c) restraint against the closing of the passageways through the walls of Nos. 13 and 15 North Broad Street. The defendant avers that the openings in the walls are "structural changes" and that the consent thereto was obtained by misrepresentation. The defendant asserts its claims for the rent in controversy and requests an accounting.
In its counter-claim the defendant also prayed that the lease be decreed to be forfeited. It is perhaps not amiss to disclose that at the final hearing some testimony was admitted over objection concerning the good faith of the complainant in challenging the right of the defendant to the rent in dispute. The defendant having prayed for a forfeiture of the lease, it was in its relation to that issue that the testimony was regarded material. During the progress of the hearing that issue was relinquished by counsel for the defendant and the testimony relevant exclusively to that phase of the cause has not been considered.
It is at once apparent that the discord between these parties reposes in the divergent interpretations and acceptation of the words "in connection with" as that phrase is employed in the definition of "gross sales." It is manifest that the defendant perceived some incertitude in that phrase of the lease, otherwise its institution of the Circuit Court action is inexplicable. Nor did the defendant avail itself of the leave then given to institute an action to recover the alleged rent.
This court, however, assumes jurisdiction because of the prayers for a reformation of the lease and the injunctive relief. The consideration of all the controversial issues may thus be discreetly undertaken to subserve the ends of justice and to repel the likelihood of recurrent litigation. Capraro v.Propati, 127 N.J. Eq. 419; 13 Atl. Rep. 2d 318;Italian-American Building and Loan Association v. Russo,130 N.J. Eq. 232; 21 Atl. Rep. 2d 857; affirmed, 132 N.J. Eq. 319; 28 Atl. Rep. 2d 196.
It is elementary that words are utilized to symbolize and communicate an idea. Often they may import both a capacious as well as a limitable concept. A court must *Page 244 
ascribe to them that interpretation which, under all the facts and circumstances, seems to subserve and not to subvert the actual intention of the parties who chose them as expressive of their mutual intentions. The cardinal rule in the interpretation of contracts, whether at law or in equity, is to ascertain and effectuate the common intention of the parties unless to do so transgresses legal principles or public policy. The intent, if lucidly expressed and distinctly manifested by the language used in the writing, must be accepted as determinative of the contractual obligation.
Occasionally, the words used are of doubtful meaning and purport, and their application to a given circumstance or event is problematical. In such an exigency, the corollary to the general rule permits an inquiry into the factual circumstances accompanying and surrounding the composition of the contract and into the objects thereby sought to be accomplished by the parties. Such an inquiry is not undertaken in any endeavor to change the writing but to illuminate its true and actual signification. Corn Exchange National Bank and Trust Co.,Philadelphia, v. Taubel, 113 N.J. Law 605; 175 Atl. Rep. 55.
Written contracts may, of course, be changed by reason of mistake. One of the most ancient and useful powers of a court of equity is its power to correct and reform writings to conform to the true convictions and intentions of the contracting parties. The power to reform is not confined to instances of an inadvertent omission or an erroneous inclusion of some matter. Indefinite or inaccurate expressions may be corrected.
Mr. Justice Washington, speaking for the Supreme Court in the early case of Hunt v. Rhodes (commonly cited Hunt v.Rousmaniere), 26 U.S. 1; 1 Pet. 1, stated in words often since repeated: "* * * where an instrument is drawn and executed which professes or is intended to carry into execution an agreement, whether in writing or by parol, previously entered into, but which, by mistake of the draftsman, either as to fact or law, does not fulfill or which violates the manifest intention of the parties to the agreement, equity will correct the mistake, so as to produce a conformity of the instrument to the agreement." *Page 245 
Mr. Justice Brandeis in Philippine Sugar, c., Co. v.Philippine Islands, 247 U.S. 385, observed: "It is well settled that courts of equity will reform a written contract, where, owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties." In accord are: Green v. Morris and Essex RailroadCo., 12 N.J. Eq. 165; affirmed, sub nom. Morris and EssexRailroad Co. v. Green, 15 N.J. Eq. 469; Louis Stern Sons v.Connolly, 95 N.J. Eq. 356; 123 Atl. Rep. 153; Cochran v.Burns, 91 N.J. Eq. 7; 107 Atl. Rep. 476; 135 A.L.R. 1452;141 A.L.R. 826.
Especially appropriate here are the remarks of the appellate court in Morris and Essex Railroad Co. v. Green, supra (atp. 475): "It is objected that the mistake, if any, was one of law, and not of fact. Such mistakes may have been corrected in equity in cases like the present. It was occasioned here by the advice and opinion of the agents of the company, one of them a lawyer, and both men of high character for intelligence and integrity. It is not a mere mistake of the party asking a reformation of the instrument, but one induced by the agents of the other party."
The words "in connection with" could imply a relationship either proximate or remote. The "true meaning" of words as we characterize it in their use in a given document, is that meaning which those who employed them were desirous of expressing. In the present case, the evidence reveals the identity of the immediate author of that particular phrase and the considerations which caused its use in the written lease. The oral evidence is admissible. Union Fur Shop, Inc., v. Max Melzer, Inc.,133 N.J. Eq. 416; 29 Atl. Rep. 2d 873; Newark Trunk Co. v.Clark, 99 N.J. Eq. 864; 132 Atl. Rep. 678; Van Syckel v.Dalrymple, 32 N.J. Eq. 233; affirmed, sub nom. Dalrymple v.Van Syckel, 32 N.J. Eq. 826.
The preliminary negotiations resulted in the adoption by the defendant of the following resolution:
"Resolved that the President and the Secretary be, and they are hereby authorized to execute a lease of the properties known as 11-13 North Broad Street, and 26 East State Street, to S.P. Dunham *Page 246 
Company, for a period of eighteen years, together with a lease of the property known as 24 East State Street for a period of six years, at a gross annual rental of 4% of gross sales; the terms of the said lease contracts to have the approval of attorneys Scammell, Knight Reese and attorneys Katzenbach, Gildea 
Rudner."
The fact is established that the composition of the lease was actually entrusted to the attorneys. Mr. Harry Lyons of the New York bar represented the present complainant. Mr. Louis Rudner of the firm of Katzenbach, Gildea and Rudner, and Mr. J. Mitchell Reese of Scammell, Knight and Reese represented the defendant. This dual representation was presumably afforded the defendant because of the interest of each of the two banking institutions. The acts of the attorneys within the scope of the delegated authority are to be regarded as the acts of their clients. Runk
v. Ten Eyck, 24 N.J. Law 756, 759.
The authorship of a tentative model of the lease was delegated to Mr. Rudner. It is expedient to permit Mr. Rudner to speak for himself (direct examination, pages 39-42):
"Q. Do you recall what occurred when Mr. Lyons saw that draft of lease?
"A. Which?
"Q. That you had left with Mr. Green?
"A. I don't know what occurred. I know I didn't see anybody except Mr. Green in August. I took a trip to the Canadian Rockies, and I came back the first week in August.
"Q. August or September?
"A. The first week in August, and after that I had discussions with Mr. Green where he made further changes. He marked up my copy. He had some thoughts of his own, and the next time I saw Mr. Lyons or anybody concerning the discussion of the change of draft, was on September 7th, 1934.
"Q. What took place on that date?
"A. That was the date we had the first discussion about this lease. My records show I conferred with Mr. Green and with Mr. Lyons, Mr. Ritter and Mr. Reese, and my best recollection is that that meeting took place at the old board room of the Trenton Banking Company. We reviewed the draft of *Page 247 
the lease which Mr. Lyons then had, and a copy of it which I had.
"Q. At that time was anything said by anyone about these particular words, `in connection with the department store premises;' that is, the sales `in connection with the department store premises?'
"A. Yes, that is paragraph 3. Mr. Lyons raised some question pertaining to the addition of the words `in connection with' after the use of the words `merchandise sold, and the selling price of all service rendered on and/or from and/or in connection with the aforesaid department store premises.' I can't give you the exact language, but I will give you the substance to the best of my recollection. Mr. Lyons asked me what I intended to cover by the words `in connection with;' that he thought the situation was covered by the other provisions of that paragraph. I told him that I wasn't sure that the other provisions of the paragraph would cover this situation, that I had understood from my experience with other department stores that department stores operate certain departments on their premises and send out in the field solicitors and canvassers, particularly in regard to ice boxes, refrigerators, washing machines, vacuum cleaners, and such articles of merchandise; that they usually sold them on conditional sale; that I wanted to have the lease cover or include four per cent. of the sales which this company would make through its agents and canvassers on the outside, when they had a department selling that merchandise in these buildings. Mr. Lyons and Mr. Ritter said there was no doubt about that, `that we certainly would intend paying you rent for that,' and I said, `well, I don't doubt you would, but it seems to me that the language without that would not adequately cover that situation, and I feel that the words `in connection with' ought to remain in the paragraph so as to make certain that that type of sales should be included.' I told them that when we worked out the Goldberg lease that question came up, and it was for the first time presented to me in that case, and after the discussion those words were inserted, and they were words which I had selected, and we finally agreed upon this language. *Page 248 
 "Q. Did you insist that those particular words remain in the lease?
"A. I said that I felt they ought to remain in the lease to cover those sales, that I was not certain that if the words were not put in, that type of sales would be included. I said, `I am living to-day; I might not be living next week or years to come, and I would rather have my job finished now than later,' or words to that effect."
Mr. Rudner is a reputable and scrupulous member of the bar and his testimony merits credence. "To give to the contract the sense in which the person making the promise believed the other party to have accepted it," is the established rule of law and equity.2 Kent. Com. 557. The objects of the parties are recognizable. The defendant had the ownership or right to the possession of certain buildings. The complainant had the mercantile enterprise. An amalgamation of these resources was expected to be gainfully productive to both parties. Incidentally, that expectation did not collapse. The annual volume of business conducted in the demised premises progressively increased from a total of $591,550 to $1,100,568 for the year ending January 31st, 1942, exclusive of sales made in No. 15 North Broad Street. It is a reasonable inference that fundamentally the minimum guaranteed rental and the rate of the percentage of gross sales to be paid by the tenant were calculated upon the size, adaptation and serviceability of the premises specifically designated in the lease. Hence, the annual credit of $5,050 was stipulated in the event of the termination of the tenancy in No. 24 East State Street. The obligation of the complainant to pay rent stems from the relation of landlord and tenant. Quid pro quo. The demised premises are referred to in the lease as "the aforesaiddescribed premises," "the aforesaid department store premises." (Italics supplied.) The rent is the compensation for the use of the defendant's property. Suppose the complainant also acquired Nos. 11 and 13 North Broad Street, would the present lease require the payment of the same rent out of total gross sales by reason solely of the continued use of No. 26 East State Street? *Page 249 
Events which have subsequently occurred and which were assuredly not in contemplation when the lease was made are not influential in the construction of the lease. The circumstances to be considered in construing it are limited to those known and those deemed reasonably to have been contemplated by the parties when the agreement was made. Those circumstances are persuasive that neither the lessor nor the lessee intended that the phrase "in connection with" should convey the broad signification which the defendant-lessor now desires to ascribe to it. To construe the phrase to encircle all sales of stock from the demised premises negotiated elsewhere by itinerant salesmen is not unreasonable, but to afford the phrase an immoderate construction is to exaggerate the actual intentions of the parties. Moreover, the lease was composed by the lessor. Martindell v. FiduciaryCounsel, 133 N.J. Eq. 408; 30 Atl. Rep. 2d 281.
The phraseology of the lease examined in the light reflected by the surrounding circumstances does not display the intention that the complainant engaged to pay, or that the defendant would receive from the complainant, rent for the use of such other properties as the complainant might thereafter acquire from others. A contrary construction would be anomalous in that it would result in the exaction of rent from one not a tenant in favor of another not the landlord and defy the common meaning of the word "rent." I conclude that the lease was not intended to encompass the unforeseen eventuality in which the complainant has acquired possession of No. 15 North Broad Street.
Having in mind that the end to be served by construction is to effectuate and yet confine, if necessary, the terms of the lease to that which reasonably appears to have been the will of the parties, it would seem to be incongruous to adjudge that the complainant is now liable to the defendant for rent based on sales made at No. 24 East State Street. It was expressly agreed that if the defendant was unable to negotiate a lease of that property and sublet it to the complainant for the period commencing June 15th, 1940, and ending June 14th, 1952, the lease "as to that property" should be "null and void." That contingency in fact occurred. The defendant *Page 250 
declined to obtain the use of the property for the complainant, and under the pertinent provision of the present lease it escapes an obligation to do so, in consideration of the allowance of the stipulated credit in reduction of the rent for the remaining portions of the demised premises. The use of No. 24 is not now supplied by the defendant. It is procured at the sole expense of the complainant. In respect of No. 24, what is the contribution of the defendant for which it is entitled to a return under the covenants of the lease?
It is suggested that the complainant by paying between June 14th, 1940, and September 29th, 1942, the rent for No. 24 in excess of $5,050 per annum, and in addition, paying to the defendant four per cent. of the gross sales made therein, has evinced in practice its conception of its obligation. The situations then and now are not comparable. Except for the period from June 15th, 1940, to September 15th, 1940, when an undivided one-fourth interest in the premises was let to the complainant by others than the defendant, the possession of No. 24 was enjoyed by the complainant under a lease from, and accordingly as a tenant of, the defendant.
My conviction is that the parties, in organizing their mutual intentions and constructing their agreement of lease, either did not envisage the stated events which have since occurred or, more probably, did not conceive and intend that the lease would be relevant and applicable to properties which the complainant might thereafter fortuitously acquire from others. It is not the permissible function of courts to enlarge contracts beyond the range of the contemporaneous intentions of the contracting parties. School Trustees of Trenton v. Bennett,27 N.J. Law 513; Burnham v. The Borden Co., 121 N.J. Law 435, 443;3 Atl. Rep. 2d 151.
Having determined that the meaning of the contentious phrase in the instrument should be delimited to fittingly express the true intent of the parties as revealed by the undisputed testimony of Mr. Rudner, I am disposed to advise a reformation of the lease accordingly. Green v. Morris and Essex Railroad Co., supra;Louis Stern Sons v. Connolly, supra; Simeone v. Varloro,107 N.J. Eq. 204; 152 Atl. Rep. 173. *Page 251 
Remaining for consideration is the dispute relating to the openings between No. 13 and No. 15 North Broad Street. This is obviously a subordinate subject of discord. A reference to the lease discloses that the lessee is denied the right to make "structural changes" without the written consent of the lessor. It is expedient initially to ascertain whether or not these openings constitute "structural changes," for if they do not, the defendant has no equitable cause for complaint.
There are three openings permitting ingress and egress between No. 13 and No. 15, one on each of the second, third and fourth floors. Each opening is four feet wide and six feet ten inches high. The wall is 166 feet in length. These openings represent a fraction over one per cent. of the squarefoot area of the walls in which they exist, and the undisputed testimony established that they have not weakened the walls in any manner. Restoration of the walls to their former state could be accomplished at a total cost of $225.
"What is or amounts to a structural change is not easy of definition. The term is elastic. In a sense a fire escape or stairway is a structure; so, also is a stepladder, a post, or a fence. By structural change, in cases of this character, I believe is meant such a change as to affect a vital and substantial portion of the premises, as would change its characteristic appearance, the fundamental purpose of its erection, or the uses contemplated, or a change of such a nature as would affect the very realty itself — extraordinary in scope and effect, or unusual in expenditure." Pross v. ExcelsiorCleaning and Dyeing Co., 179 N.Y.S. (at p. 179).
Measured by this concept, it is altogether reasonable to conclude that these openings do not fit that description. Such cases as Klie v. Von Broock, 56 N.J. Eq. 18;37 Atl. Rep. 469, and Union County Trust Co. v. Goerke Co., 105 N.J. Eq. 190; 147 Atl. Rep. 439, modifying 103 N.J. Eq. 159;142 Atl. Rep. 560, cited by defendant, and Peer v. Wadsworth, 67 N.J. Eq. 191; 58 Atl. Rep. 379, somewhat factually similar to the case here, deal with the question of waste, which is beyond the issue raised by the pleadings here. Moreover, a covenant in a lease permitting a tenant to make *Page 252 
alterations short of structural changes may reasonably be considered as tacit authority to do so notwithstanding such would, under equitable conceptions, constitute waste. Cf. Agate
v. Lowenbein, 57 N.Y. 604, cited in Klie v. Von Broock,supra; 2 Story Eq. Jur. (12th ed.) § 915.
The defendant consented in writing to the construction of the passageways, from which it is inferred that no substantial or irreparable injury to the demised premises was then apprehended. The size of the proposed openings was not then specified or restricted. Their use for whatever purpose does not transform their character. I am not convinced that a representation that No. 15 was to be used exclusively for storage purposes, if such was in fact made, was at the time a false profession of the immediate intention of the complainant, or a representation without which the consent would have been withheld. The complainant in the circumstances will not be directed to close the existing passageways.
The propensity of this court is to do that which in the existing circumstances is equitable and just.
The construction of the provisions of the lease here expressed is not to be understood to condone the removal by the complainant of any of its most lucrative and remunerative departments from the demised premises to other premises in the endeavor to diminish the rent to which the defendant is justly entitled under the covenants of the lease. The obligation of the complainant to conduct a general department store business in the demised premises is implicit throughout the lease. The evidence discloses that the complainant has moved its toy and domestic departments, previously located on the first floor of No. 26 East State Street, to the second floor of No. 15 North Broad Street. If the defendant has reason to believe that the mobilization of departments by the complainant is operating to the financial disadvantage of the defendant (a subject concerning which the evidence is exceedingly meagre), and if the parties are unable to agree upon an equitable adjustment, I shall, upon terms, empower a master to inquire and report.
A decree effectuating the conclusions here expressed, will be advised. *Page 253