Sol MINZER et al., Appellants,

v.

**FIRST NATIONAL BANK IN DALLAS,**
Appellee.

No. 16488.

Court of Civil Appeals of Texas.

Dallas.

April 30, 1965.

Rehearing Denied May 28, 1965.

Wynne, Jaffe & Tinsley and Harold Hoffman, Dallas, for appellants.

Coke & Coke, J. Edwin Fleming, Dallas, for appellee.

DIXON, Chief Justice.

Appellants Sol Minzer, Harry Mark and Fritz Glazer, landlords, filed this suit against their tenant, appellee First National Bank in Dallas, hereinafter called the Bank, seeking forfeiture and cancellation of a long term lease contract.

The relief originally requested by appellants was that the Bank be enjoined from continuing to construct or maintain a 50-story banking house and office building in such a way that the part of the building covering appellants' land will be structurally connected with the other part of the build-ing covering adjoining land; that a mandatory injunction issue commanding the Bank to alter, reconstruct, or demolish said building; and in the alternative that the lease be declared forfeited and cancelled, and appellants restored to possession of their property.

Before the case came on for trial the Bank had completed the structure. In oral argument appellants stated that they no longer asked for injunctive relief but were asking only for cancellation of the lease contract and restoration of possession of their property.

On July 23, 1954 appellants and the Bank entered into a written agreement whereby for a term of 95 years and four months appellants as lessors leased to the Bank as lessee a tract of land 50 feet wide and 200 feet deep running from Elm Street to Pacific Avenue in downtown Dallas.

The lease contract provides:

"2. As used herein, 'improvements' shall mean the building or buildings now located on the above-described land, as well as any buildings, building, *or part thereof,* that may hereafter, from time to time, be located thereon during the term of this lease.

\* \* \* \* \* \*

"4. Lessee shall have the continuing right at all times during the existence of this lease to alter or remodel improvements, *and in addition, to demolish all or any part thereof and build new and different types of improvements,* constructed of any type of materials, in lieu of the improvements so demolished, *all as Lessee may desire,* except that (a) no such alteration or remodelling of improvements shall substantially reduce the value of said improvements below what it was immediately prior to such alteration or remodelling, and (b) in event of demolition by Lessee, the improvements so demolished shall be replaced, prior to termination of this lease, by improve-

ments costing Lessee at least One Hundred Thousand Dollars ($100,000.-00),· or at Lessee's election, Lessee shall pay Lessor such amount, upon termination of this lease." (Emphasis supplied.)

In 1951 the Bank had built a seven-story structure consisting of motor banking facilities and a parking garage on leased property adjoining that of appellants. After leasing appellants' property in 1954 the Bank demolished the building then on appellants' land and enlarged the motor bank and parking garage by constructing a ten-story building on appellants' land, the top three stories of which extended over and added to the seven-story structure already in use. Several walls were eliminated so that the improvements on the two adjoining tracts of land were made available for use and were used as one building.

In 1960 the Bank acquired other adjoining properties by deeds and long term leases. The properties so acquired constitute an entire block in the business district of Dallas, being bounded on the South by Elm Street, on the East by Akard Street, on the North by Pacific Avenue and on the West by Field Street.

After acquiring the above properties the Bank demolished the structures existing on them including the enlarged motor bank and parking garage, part of which had been on appellants' land. The 50-story banking house and office building was then constructed covering the entire city block above described, including appellants' property.

The trial court sustained a motion for summary judgment filed by the Bank. Judgment was rendered that appellants take nothing by their suit.

In their first and third points on appeal appellants say that the court erred in granting a summary judgment because (1) said "judgment was based on an erroneous construction of the terms of the lease agreement"; and (3) if the lease agreement does not expressly or impliedly prohibit the conduct of the Bank, then the lease contract is ambiguous in that respect, and there is a fact issue regarding the intentions of the parties.

The gist of appellants' complaint in these two points is that the Bank violated the terms of the lease contract of July 23, 1954 by building one large integrated structure covering several tracts of land, said structure uniting the improvements over appellants' land with the improvements over adjoining tracts in such a manner that appellants' reversionary interest in their property is incapable of separation from the improvements on adjoining lands. Appellants say that their reversionary interest is thus damaged by being made less desirable and less marketable.

■ In our opinion the lease contract between appellants and the Bank is not ambiguous. Article 2 of the contract clearly authorizes the Bank to build *part of a building* on the premises leased from appellants. Article 4 of the contract expressly states that the Bank *"shall have the continuing right to demolish 'improvements' and build new and different types of improvements * * * all as lessee may desire."* (Emphasis supplied.)

Appellants admit that the contract permits the Bank to construct part of a building on appellants' land; nevertheless appellants contend that the contract does not, either expressly or by implication, grant to the Bank the right to connect that part of a building to a part of a building on adjoining land.

■ We cannot agree with appellants. As we see it, if a tenant is permitted by the terms of a lease contract to build only part of a building on leased premises, it follows by implication that such part of a building may be connected to the other part of the building on other premises. We think it would be absurd to construe this lease contract to mean that the Bank is given permission to cover appellants' land with part of a building but such part must

stand separate, alone and isolated—disconnected with the other part of the building on adjoining land.

■ Our analysis of the agreement also finds support in that part which provides that after demolishing existing improvements the tenant may build new and different types of improvements in lieu of the demolished buildings—"all as Lessee may desire." As our Supreme Court said in Woods v. Sims, 154 Tex. 59, 273 S.W.2d 617, 620: "Generally the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement, and this purpose should not be thwarted except in the plainest case of necessary repugnance."

■ Appellants contend that by joining the improvements over appellants' land with the improvements over adjoining tracts the Bank has committed common law waste. In support of this view appellants cite us to several cases in which restaurant owners, department store operators, and others have leased adjoining properties and have endeavored to convert the improvements on them into one structure for business uses by eliminating walls between them or cutting passageways between them. Hamburger & Dreyling v. Settegast, 62 Tex.Civ.App. 446, 131 S.W. 639; F. W. Woolworth v. Nelson, 204 Ala. 172, 85 So. 449; Klie v. Von Broock, 56 N.J.Eq. 18, 37 A. 469.

Common law waste has no application when, as is the case here, under the terms of the lease contract itself the tenant has the right to connect improvements on one tract he has leased to improvements on an adjoining tract which he has also leased. In none of the cited cases did the tenant have the express right to demolish the existing improvements; or have the express right to construct part of a building on the leased premises; or have the express right after demolishing an existing building to construct in lieu thereof buildings of various types—all, as the tenant desired.

■ Since the lease contract is not ambiguous extrinsic evidence was not needed and was not admissible to explain its terms. Appellants' first and third points are overruled.

■ In their second point appellants assert that there is a fact issue as to whether under Article 4(a) of the lease agreement the alteration or remodeling of improvements substantially reduced the value of said improvements below what it was immediately prior to such alteration or remodeling.

There is no fact issue under Article 4 of the lease. The Bank did not avail itself of its right under Article 4 to alter or remodel existing improvements on appellants' land. What it did was to avail itself of its continuing right under the express terms of said article to *demolish* the existing improvements. Under the circumstances clause (a) of Article 4 is not applicable. Clause (b) is applicable. And clause (b) very plainly provides that in the event of demolition by lessee the improvements so demolished shall be replaced *prior to termination of the lease* by improvements costing lessee at least $100,000, *or at lessee's election* lessee shall pay lessor such amount, *upon termination of the lease.* Only at the termination of the lease do lessors have the right to complain of the breach of clause (b), and then only if the improvements constructed by lessee to replace the demolished improvements cost less than $100,000. Even if such should turn out to be the case, the Bank could comply with clause (b) by the payment of $100,000 to lessors. Appellants' second point is overruled.

The judgment of the trial court is affirmed.

Affirmed.